RECEIVED

JUL - 7 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO: 06-60059 |
| VERSUS | JUDGE DOHERTY |
| GEORGE CELESTINE (1)<br>SIDNEY GALLIEN (2)<br>TELLY GALLIEN (3)<br>TRAVIS GALLIEN (4) | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING ON REPORT AND RECOMMENDATION

Pending before this Court is a "Report and Recommendation on Motion to Dismiss Indictment" issued by United States Magistrate Judge Michael Hill [Doc. 83], who recommends the Motion to Dismiss Indictment filed by George Celestine [Doc. 75] be *granted*, while the Motions to Dismiss Indictment filed by Sidney Gallien [Doc. 76], Telly Gallien [Doc. 74], and Travis Gallien [Doc. 64][1] should be *denied*. Objections to the Report and Recommendation were filed. This Court, thereafter, held a status conference with all parties and requested additional briefing on the application of Federal Rule of Criminal Procedure 48(b).[2] For the following reasons, this Court hereby **ADOPTS IN PART, however DECLINES TO ADOPT IN PART** the findings of fact and conclusions of law and recommendation addressed in Magistrate Judge Hill's Report and

---

[1] On May 16, 2007, Travis Gallien filed an additional Motion to Dismiss Indictment [Doc. 95], in which Travis Gallien specifically argues the indictment should be dismissed for violations of his Sixth Amendment Right to a speedy trial. The government opposes the motion. [Doc. 97]. This Court will address the second Motion to Dismiss in this Memorandum Ruling rather than issuing a separate ruling.

[2] Magistrate Judge Hill noted in note 13, Rule 48(b) had not been pled by any party. In his objections to the Magistrate Judge's Report and Recommendation George Celestine argued that, in fact. he had pled Rule 48(b) and the remaining defendants argue that although not directly pled, Rule 48(b) should, also, be applicable to them. Thus, this Court ordered additional briefing. The parties requested multiple extensions to the briefing schedule and thereafter, requested a further delay in light of plea negotiations, which was granted. Nonetheless, ultimately, a briefing deadline was reset and all briefing has now been received by the Court.

Recommendation, and **DENIES IN PART** and **GRANTS IN PART**, George Celestine's, Travis Gallien's, Telly Gallien's and Sidney Gallien's Motion to Dismiss.

## FACTS AND PROCEDURAL HISTORY

As all facts are so intertwined with the Court's *de novo* review, the Court will revisit all facts of the underlying issues within this ruling. This matter was originally docketed as Criminal Matter Number **01-60127** on **November 16, 2001.** The procedural history includes *three declared mistrials,* the first on **May 7, 2003**, the second on **October 8, 2004**, the third on **June 26, 2006**, which was followed by a request from the government for reconsideration, which, in turn, was granted in light of an anticipated *dismissal* **of the indictment, without prejudice** as to the four remaining defendants. A subsequent *reindictment* was filed on **September 15, 2006**. The current indictment, as did the previous, alleges criminal activity **spanning ten years** and **dating back as much as** *sixteen years***,** namely **from January 1, 1991,** and **concluding** nearly *six and one-half years ago,* on or around **November 13, 2001** and **reaching from Texas to Louisiana and "elsewhere" within the United States**. [Doc. 1].[3]

Ten defendants were named in the November 16, 2001 16-count indictment charging all defendants with drug and weapons charges, Criminal Matter Number 01-60127.[4] Notably, in Count 1 of the indictment, all ten co-defendants were charged with "conspiracy to distribute cocaine and cocaine base (crack cocaine)." The government, also, specifically referenced within the indictment

---

[3] For the purposes of this discussion, the Docket Entries identified in this portion of the factual background and procedural history refer to entries related to Criminal Matter No. 01-60127, unless otherwise indicated.

[4] The following defendants were named in the original Indictment: (1) **George Celestine**, count(s) 1, 2, 5, 6, 10; (2) **Samuel Lasalle Thomas**, count(s) 1, 2; (3) **John Fontenot**, count(s) 1, 3; (4) **Sidney Gallien**, count(s) 1, 4, 5, 6, 7; (5) **Telly Gallien**, count(s) 1, 14; (6) **Travis Gallien**, count(s) 1, 11, 12, 13, 16; (7) **Raleigh Brown**, count(s) 1, 8, 9; (8) **Arthur Ray Charles**, count(s) 1, 10; (9) **Juliet Sampey**, count(s) 1, 10; (10) **Erritt Gallien**, count(s) 1, 15.

a number of "unindicted co-conspirators" in its recitation of "overt acts" in furtherance of the conspiracy and "ways and means of accomplishing the conspiracy."

On **January 23, 2002**, Celestine, the alleged ringleader, appeared for an initial appearance before Magistrate Judge Hill. At that time, Celestine pled not guilty; the government moved for detention; and requested a continuance of the detention hearing, which was granted by Magistrate Judge Hill. [Doc. 26]. On **January 23, 2002**, a Criminal Scheduling Order issued as to Celestine, **setting trial for March 4, 2002**. The Scheduling Order specifically notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 29].

On **January 23, 2002**, co-defendant Raleigh Brown (Brown) appeared before Magistrate Judge Hill, pled not guilty, and was released on bond. [Doc. 41]. Trial was set for March 4, 2002, and the Criminal Scheduling Order notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 46].

On **January 24, 2002**, **Sidney Gallien, Telly Gallien, Travis Gallien, and Erritt Gallien appeared** before Magistrate Judge Hill and pled not guilty. As to Telly Gallien and Travis Gallien, the government recommended release; they were released on bond by Magistrate Judge Hill. As to Sidney Gallien and Erritt Gallien, the government moved for detention and requested a continuance of the detention hearing, which was granted by Magistrate Judge Hill. On **January 24, 2002**, Criminal Scheduling Orders issued as to Sidney Gallien, Telly Gallien, Travis Gallien and Erritt Gallien, **setting trial for March 4, 2002**. The Scheduling Orders specifically note, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Docs. 52, 62, 82].

On January 25, 2002, Erritt Gallien was released on bond by Magistrate Judge Hill. [Docs. 73, 74]. On January 30, 2002, Sidney Gallien was released on bond by Magistrate Judge Hill upon consideration of pretrial services report, testimony by the government's witness, Agent Joseph Pisano, Jr. (Pisano), special agent, FBI, and testimony by Sidney Gallien's witness, Minor Travis. [Docs. 48, 52, 56, 66, 76, 107].

On **January 25, 2002,** Magistrate Judge Hill heard testimony as to the detention of Celestine from the government's witness, Pisano, and from Celestine's witnesses, Faye Celestine, Beau Wilfred and Douglas Sampey, as well as Celestine. Based on his consideration of the evidence submitted, **Magistrate Judge Hill ordered Celestine detained pending trial**. [Docs. 84, 85].

On **January 25, 2002**, co-defendant Arthur Ray Charles (Charles) appeared before Magistrate Judge Hill, pled not guilty, and was released on bond. [Doc. 87]. Trial was set for March 4, 2002, and the Criminal Scheduling Order notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 93].

On **February 19, 2002,** this Court granted a **Motion to Continue Pre-Trial and Trial Date,** filed on behalf of **all** defendants **and** the government. [Doc. 120]. This Court specifically found that a denial of the continuance would deny counsel for the defendants necessary time to properly prepare for trial, pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(8)(B)(iv). Trial was **reset for September 9, 2002**. Celestine and Sidney Gallien filed affidavits on February 8, 2002, and March 1, 2002, respectively, waiving their rights under the Speedy Trial Act. [Docs. 117, 132 ].

On **February 19, 2002, co-defendant, Juliet Sampey (Sampey), appeared** before Magistrate Judge Hill, pled not guilty, and was released on bond. [Doc. 122]. On **February 21, 2002,** a Criminal Scheduling Order as to Celestine, Sidney Gallien, Telly Gallien, Travis Gallien,

Brown, Arthur Ray Charles, Sampey, Erritt Gallien issued; **trial was set for September 9, 2002**. The Scheduling Order notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 129].

On *April 12, 2002*, **Celestine filed a "Motion for Bill of Particulars for Names and Addresses of Un-Indicted Co-Conspirators,"** noting the government alleged Celestine "conspired with both named and un-named co-conspirators" and seeking an Order directing the government to file a bill of particulars *disclosing the names of "un-indicted alleged co-conspirators the government will call at trial."* [Doc. 138]. The **government opposed** the motion, arguing **the matter was set for trial on September 9, 2002**, and the government *"has not begun to consider potential witnesses;"* however, *"when a witness list is formulated, and if any unindicted co-conspirators are on the list, the government will gladly provide those names to the defendant."* [Doc. 143, April 25, 2002]

On **April 1, 2002, co-defendant Samuel Lasalle Thomas (Thomas), was arrested** in Texas, and was detained pending trial. [Doc. 141]. On May 9, 2002, Thomas appeared before Magistrate Judge Hill, pled not guilty, and was detained pursuant to the previous detention order. [Doc. 147]. **Trial was set for September 9, 2002.** The Criminal Scheduling Order noted, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 147, 148].

On **May 7, 2002**, Celestine filed a **Motion to Suppress**. [Doc. 146]. On October 31, 2002, after the government had opposed the motion [Doc. 165] and Magistrate Judge Hill had issued a Report and Recommendation [Doc. 186], this Court granted the Motion to Suppress. [Doc. 212].

On *May 21, 2002*, Magistrate Judge Hill issued a **Ruling on Motion for Bill of Particulars**, in which Magistrate Judge Hill **GRANTED** Celestine's Motion for Bill of Particulars. Magistrate Judge Hill rejected the government's argument that the motion was premature in view of the September 9, 2002 trial date. **Magistrate Judge Hill specifically noted that** *"the purpose of a Bill of Particulars is to assist the defendant in the preparation of his defense and to prevent unfair surprise at trial,"* citing *United States v. Linn,* 889 F.2d 669 (5th Cir. 1989)(emphasis added). Additionally, Magistrate Judge Hill noted, **"on proper motion, the Bill should be granted and** *the names of the unindicted coconspirators should be disclosed to the defendant,"* citing *United States v. Hughes,* 817 F.2d 268 (5th Cir. 1987)(emphasis added) and *United States v. Barrentine,* 591 F.2d 1069 (5th Cir. 1979). Accordingly, on *May 21, 2002* **Magistrate Judge Hill granted the Motion for Bill of Particulars** and **ORDERED** *the government to disclose the names of unindicted coconspirators who it will call as witnesses at trial.* Magistrate Judge Hill additionally stated in his Order that **"the disclosure of names of the unindicted coconspirators who may testify are to be disclosed** *AS SOON AS PRACTICABLE,* **and** *THE GOVERNMENT IS TO SUPPLEMENT ITS RESPONSE* as required by Rule 7(f) FED.R.CR.P."[5] [Doc. 157](emphasis added). **The government did not appeal or otherwise seek to alter or amend this Order.**

On **June 25, 2002,** Celestine filed a **Motion for Reconsideration of Magistrate Judge Hill's Detention Order,** arguing he should be released from detention pending trial as the Lafayette Parish District Attorney dismissed a pending criminal charge forming in part the basis for Celestine's

---

[5] FED.R.CRIM.P. 7(f) provides:

The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 10 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires.

detention .[6] [Doc. 162]. On June 28, 2002, the Motion for Reconsideration was **DENIED**. [Doc. 164].

On **August 9, 2002, Thomas** filed a **Motion to Continue** the Pre-Trial Conference and Trial dates, **noting he had not yet received discovery in this matter**. The motion was unopposed; no motion to sever was filed. This Court **GRANTED** Thomas's motion on August 13, 2002 [Doc. 172]. On **August 15, 2002**, this Court issued a **Criminal Scheduling Order** as to Celestine, Thomas, Sidney Gallien, Telly Gallien, Travis Gallien, Brown, Charles (Charles), Sampey, and Erritt Gallien [Doc. 173], **setting the matter for trial on November 4, 2002**. The Scheduling Order notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 173]. No motions or objections were filed with respect to the November 4, 2002 trial date.

On August 27, 2002, and on August 29, 2002, this Court issued Amended Scheduling Orders [Docs. 179, 182] to reduce or eliminate the use of boilerplate, formula motions and responses. The Amended Scheduling Orders again identified the November 4, 2002 Trial date and again noted, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Docs. 179, 182]. No motions or objections were filed with respect to the November 4, 2002 trial date.

On **October 9, 2002**, a Joint Status Report was submitted by the government, Celestine, Thomas, Sidney Gallien, Travis Gallien, Brown, and Erritt Gallien. **In that Status Report the government asserted *Jencks Act* material "has been provided**." [Doc. 189].

---

[6] This was Celestine's first motion for reconsideration of Magistrate Judge Hill's Detention Order; there were multiple requests; each was opposed by the government.

On **October 15, 2002, an "Unopposed Motion to Continue Trial Date"** [Doc. 192], was filed by Sampey's counsel, arguing for additional time to evaluate the case and adequately prepare for trial. Counsel advised he was enrolling to replace Sampey's prior counsel. Counsel argued the indictment is a 16-count indictment involving nine other defendants; the government had no objection to the continuance, nor did any other co-defendant; however, Sampey's new counsel was unable to reach Greg Thibodeaux, attorney on behalf of Telly Gallien, prior to the filing of the motion to continue the trial date. [Doc. 192]. This Court, in the interests of justice, granted the unopposed motion to continue the trial date. [Doc. 193]. On October 15, 2002, a new Criminal Scheduling Order issued by this Court [Doc. 194], **setting the trial date for February 3, 2003.** The Criminal Scheduling Order once again noted, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 194]. No motions or objections were filed with respect to the February 3, 2003 trial date.

On **September 27, 2002, co-defendant, John Fontenot was arrested** [Doc. 187], and **appeared** before Magistrate Judge Hill, and pled not guilty on **October 17, 2002.** Fontenot was released on bond; trial was set for **February 3, 2003.** [Doc. 198].

On **November 14, 2002,** co-defendant **Brown pled guilty** to Count 9 of the indictment, distribution of cocaine base (crack cocaine). [Docs. 226-230]. Per the terms of his plea agreement, Brown agreed to "cooperate fully" in the government's investigation and prosecution of the matter as well as other investigations and prosecutions, including testifying at trial.[7] On **November 14, 2002,** co-defendant **Charles pled guilty** to Count 10 of the indictment, possession with intent to distribute cocaine. Per the terms of his plea agreement, Charles agreed to "cooperate fully" in the

---

[7] On July 10, 2006, the government filed a Motion to Reduce Sentence Pursuant to 5k1.1 of the United States Sentencing Guidelines [Doc. 566], which was granted by this Court on July 11, 2006. [Doc 582].

government's investigation and prosecution of the matter as well as other investigations and prosecutions, including testifying at trial.[8]

On **December 4, 2002**, this **Court consolidated the trial as to the remaining defendants**, and issued a Criminal Scheduling Order as to George Celestine, Thomas, Fontenot, Sidney Gallien, Telly Gallien, Travis Galllien, Sampey, and Erritt Gallien, **setting the trial on February 3, 2003**. The Scheduling Order notes, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Docs. 232, 233]. No motions or objections were filed with respect to the February 3, 2003 trial date.

On **January 16, 2003**, co-defendant **Thomas pled guilty** to Count 1 of the indictment, conspiracy to distribute cocaine and cocaine base (crack cocaine). [Docs. 255-259]. Per the terms of his plea agreement, Thomas agreed to "cooperate fully" in the government's investigation and prosecution of the matter as well as other investigations and prosecutions, including testifying at trial.[9] [Doc. 256] On **January 16, 2003**, co-defendant **Sampey pled guilty** to one count of a Bill of Information charging her with interstate travel in aid of illegal activity. [Docs. 251-254]. Per the terms of her plea agreement, Sampey agreed to "cooperate fully" in the government's investigation and prosecution of the matter as well as other investigations and prosecutions, including testifying at trial.[10]

---

[8] On July 10, 2006, the government filed a Motion to Reduce Sentence Pursuant to 5k1.1 of the United States Sentencing Guidelines [Doc. 565], which was granted by this Court on July 11, 2006. [Doc 583].

[9] It is noted Thomas later filed a **Motion to Withdraw a Plea of Guilty** [Doc. 306]; however, on July 1, 2003, he filed a **motion to withdraw the motion** [Doc.386], which was granted by this Court on July 8, 2003. [Doc. 387]. On July 10, 2006, the government filed a Motion to Reduce Sentence Pursuant to 5k1.1 of the United States Sentencing Guidelines [Doc. 567], which was granted by this Court on July 11, 2006. [Doc 580].

[10] On July 10, 2006, the government filed a Motion to Reduce Sentence Pursuant to 5k1.1 of the United States Sentencing Guidelines [Doc. 564], which was granted by this Court on July 11, 2006. [Doc 584]

It is noted that, **as of January 16, 2003**, the **remaining defendants** who chose to exercise their rights to trial were the following: (1) **Celestine**, (2) **Sidney Gallien**; (3) **Telly Gallien**, (4) **Travis Gallien**, (5) **Erritt Gallien**, and (6) **Fontenot**. Additionally, **as of January 16, 2003, Celestine was the** *only* **defendant detained pending trial**.

On **January 22, 2003**, co-defendant Fontenot filed a "**Second Unopposed Motion to Continue Trial Date**" **[Doc. 265]**, noting Fontenot had been detained in Texas until transferred to Louisiana. Additionally, Fontenot averred further investigation and preparation was necessary by "all parties" in this case because "this prosecution involves **numerous statements from cooperating individuals**" but "**discovery has not been completed** and the **defendant would need time to investigate the government's evidence**." Fontenot specifically requested his continuance pursuant to the Speedy Trial Act, 18 U.S.C. § 3161(h)(8)(B)(I) and(iv). [Doc. 265] (emphasis added). On **January 23, 2003, this Court granted Fontenot's motion** in the interest of justice, and **reset the trial for May 5, 2003**. [Doc. 268]. On **January 24, 2003, a Criminal Scheduling Order was issued** by the Court, noting, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately."[11] [Doc. 270].

On **February 4, 2003, Celestine filed another Motion for Release from Detention**, arguing he had been detained for an impermissibly long period of time under the Speedy Trial Act.[12] [Doc. 279]. The government again opposed Celestine's request. On **February 4, 2003**, Celestine filed a **Motion to Dismiss** the indictment with prejudice arguing the government had failed to try him

---

[11] On February 28, 2003, the trials for the remaining defendants were consolidated for trial on May 5, 2003. [Docket Entry, 2/28/2003].

[12] This was Celestine's first motion for reconsideration of Magistrate Judge Hill's January 31, 2002 Detention Order but his second request to be released from detention.

within 70 days pursuant to the Speedy Trial Act. There is no mention in the motion of: (1) Celestine's prior waiver of his rights under the Speedy Trial Act; (2) continuances requested on behalf of all defendants granted based on an ends of justice analysis; (3) various motions, including a June 28, 2002 motion to Reconsider the Detention Order, May 7, 2002 Motion to Suppress, and a February 4, 2003 Motion for Release from Detention, which were filed by Celestine; and (4) provisions under the Speedy Trial Act which provide for periods of time which are not to be considered. [Doc. 283]. The **Motion to Dismiss** was denied by this Court at the pretrial conference held **April 16, 2003**. [*See* Doc. 299 for full details].

On **April 2, 2003**, the parties submitted a **Joint Status Report** indicating: (1) **a hearing outside the presence of the jury may be required on Rule 404(b) evidence**; (2) there were no pending discovery problems; and (3) **all *Jencks Act* material had been provided**. [Doc. 291].

Upon suggestion of counsel, on **April 20, 2003**, this Court conducted a **status conference to discuss potential conflicts of interest of certain defense counsel**. Defense counsel were advised to contact those former clients identified by the government, and their present clients and thereafter contact the Court on May 1, 2003, to advise whether or not: (1) potential conflicts existed; if so, whether those are of a nature that can be waived; and (2) if so, whether defendants consented to waive potential conflicts. [Doc. 307].

On **April 21, 2003, Magistrate Judge Hill denied Celestine's Motion for Release** from Detention **upon opposition by the government** [Doc. 300], and **recommended Celestine was not entitled to the relief under the Speedy Trial Act** requested because Celestine: (1) was in part at "fault" for the delays in this matter; (2) moved for or acquiesced in the continuances, which were granted after a finding by the Court that the ends of justice were best served by granting the

continuance; and (3) had not been brought to trial because of his own actions. Additionally, given the facts presented to Magistrate Judge Hill at the detention hearing, Magistrate Judge Hill determined ongoing detention remained reasonable. [Doc. 300].

On **May 1, 2003, Fontenot pled guilty** to Count 1 of a Bill of Information charging him with possession with intent to distribute cocaine on or about June 15, 2002. Per the terms of his plea agreement, Fontenot agreed to "cooperate fully" in the government's investigation and prosecution of the matter as well as other investigations and prosecutions, including testifying at trial.[Docs. 308-315].[13]

On **April 29, 2003,**[14] the government provided to defense counsel a document entitled,

---

[13] Of particular interest is the history of co-defendant Fontenot's plea. At Fontenot's **July 11, 2006** sentencing hearing at which Fontenot's wife testified under oath, upon her testimony, it became apparent to the Court that notwithstanding an in-depth colloquy and admissions made by Fontenot at his guilty plea, Fontenot had pled guilty to a crime on dates on which it would seem, he could not have committed the crime as alleged. Discussion was had with both counsel; sentencing was suspended "pending notification from counsel that they are ready to proceed" with the assurance the "confusion" would be corrected. [Doc. 581]. However, notwithstanding representations to the Court that the parties would correct the "confusion" and thereafter notify the Court when they were ready to proceed, this did not occur. Rather, on February 2, 2007 the government filed a Motion Requesting Sentencing Date. This Court set sentencing and at that second sentencing hearing learned counsel had **not** addressed the problem recognized by the Court at the original sentencing. [Doc. 601] Thereafter, this Court **again**, was unable to sentence Fontenot and began a journey whereby this Court presided over **multiple hearings** at which counsel were admonished for failing to take whatever corrective action they deemed appropriate so that this matter could proceed to sentencing or for failing to file whatever pleadings either or both deemed appropriate in order to have the guilty plea upset. On **April 12, 2007**, this Court was given to understand by both counsel, Fontenot would file an unopposed Motion to Withdraw his guilty plea, the government would file a new Bill of Information properly charging him with the crime committed on the correct date, and Fontenot thereafter, would plead guilty to the new charge reflecting the "proper" dates. [Doc. 606] However, upon Fontenot's Motion to Withdraw Guilty Plea, the government *opposed* the motion, arguing defendant had shifted his position, thus prompting objection by defendant, and this Court again to set yet another hearing. Ultimately, on **May 29, 2007**, counsel for the government advised that a new Bill of Information would be filed and that the defendant had agreed to plead guilty to the new Bill of Information. Upon entry of the plea under the new Bill of Information, the government would agree to dismiss the original, problematic Bill of Information. Fontenot's Motion to Withdraw the Plea [607] thus, was granted by this Court *without objection by the government*. The government orally moved to dismiss the prior Bill of Information, which was also granted. [Docs. 607-610]. A new Bill of Information, Criminal Number 07-60017 was submitted charging Fontenot with having possessed with intent to distribute on April 15, 1997. Fontenot pled guilty to one count of possession. [Crim. No. 07-60017, Docs. 1-5].

[14] On **May 21, 2002** Magistrate Judge Hill had ordered the government to disclose the names of unindicted co-conspirators who it will call as witnesses at trial. . . **"as soon as practicable,"** and **"to supplement** its response as required by Rule 7(f). . . ."** **As of this filing in April 2003, the government had yet to comply with Judge Hill's order.**

"Government's Witness List - Alphabetical Order," in which the government listed 86 names of "individuals" who "may be called as witnesses during the trial of this case." The list did not delineate co-conspirators as ordered by Magistrate Judge Hill. Included within the 86 names listed was "Jonathon Jefferson." There was no mention of a "Wayne Jefferson," "Johnathon Wayne Jefferson," nor "Johnathan W. Jefferson;" nor was there listed a "Kenneth 'Rock' Gage." [Crim. No. 06-60059, Doc. 88-3, Exh. A] On **April 30, 2007**, counsel for all parties met to review the government's April 29, 2003 "witness" list. The AUSA contends he, at this meeting, orally identified the unindicted co-conspirators the government would call at trial; all four defense counsel contend this did not occur. [Trial Tr. vol. I, 443-449, May 6, 2003].

On **May 5, 2003, trial on the four remaining defendants, namely Celestine, Sidney Gallien, Travis Gallien, and Telly Gallien, commenced.**[15] **As of the May 5, *2003* trial, notwithstanding Magistrate Judge Hill's May 21, *2002* Order, the government had not complied with the order and had not provided defendants with a written list of unindicted co-conspirators the government intended to call at trial.** Trial, nonetheless, began without further objection. Soon thereafter, however, Celestine, Sidney Gallien, Travis Gallien, and Telly Gallien moved for a mistrial following certain statements made during opening statement by the government referencing an "organization" and certain government witnesses. The motion was DENIED. The government thereafter, called **Jonathon Wayne Jefferson** to the stand. **Jefferson testified as to a conversation he had with "Kenneth 'Rock' Gage" to support the existence of the charged conspiracy. All defendants objected and again moved for a mistrial arguing the government**

---

[15] It is noted that, by agreement of May 1, 2003 and of all parties, Erritt Gallien was not to plead guilty to the federal charge or proceed to trial before this jury. It was anticipated and agreed Erritt Gallien would ultimately plead guilty to a state charge related to the drug trafficking offenses charged in the federal indictment. [Doc. 595].

had called "Jonathon Wayne Jefferson" as a witness, who testified as an unindicted co-conspirator, as to certain other un-indicted co-conspirator statements, i.e., Gage, as evidence of the existence of the conspiracy, yet the government had failed to identify Jefferson as an unindicted co-conspirator the government would call at trial, and had failed to identify Gage, all in violation of Magistrate Judge Hill's 2002 Order. The government responded by shifting the focus from noncompliance to arguing *notice* had been provided thus, no prejudice could flow, thus no consequence should be had. All defendants argued the government had not *listed* as ordered - nor *identified* [which] unindicted co-conspirators they intended to call at trial. Further, all defendants argued they, also, *did not* have *notice* particularly as to Jefferson and Gage. Defendants argued that although the government had produced certain information relative to a "Jonathon Jefferson," the information had been presented *only one week before trial, did not identify Jefferson as an unindicted co-conspirator*, and to the extent the government had provided information as to Jefferson in some other form, the information **had not identified the witness in the same manner called at trial**, i.e., *Wayne* Jefferson vs. *Jonathon* Jefferson, nor identified him as an unindicted co-conspirator whose testimony implicated the existence of the *conspiracy* charged against the defendants, nor had Gage been identified.[16] This Court took the motion for mistrial under

---

[16] The government argues that at some point prior to Magistrate Judge Hill's May 21, 2002 Order, the government had provided defense counsel with a Federal Bureau of Investigation Form FD-302 (hereinafter referred to as a "302"), indicating "Kelvin Jackquet" (Jackquet) provided information to the F.B.I. that: (1) his "Houston" source of drugs was "Wayne Jefferson," whose brother is "Willie Jefferson;" (2) Celestine dealt directly with "**Jefferson**;" (3) Jackquet's "Atlanta" source of drugs was "**Anthony** Gage;" (4) "**Gage**" traveled to Louisiana to pick up money Celestine owed Jackquet; (5) Celestine would send an individual by the name of "Kenny" by bus to Houston to acquire cocaine from Jackquet; (6) Jackquet sold powder cocaine to Celestine; and (7) Jackquet sold cocaine to "**Johnathan Winters**." The 302 does not reference a "**Jonathon Jefferson** or "**Kenneth 'Rock' Gage**."

[Crim. No. 06-60059, Doc. 88-3, Exh. B]. **Counsel on behalf of Sidney Gallien and Telly Gallien contend they were not supplied the copy of the 302.** [Trial Tr. vol. II, 471, 501, May 6, 2003]

At some point, some several weeks before the May 2003 trial, the government also provided a record of criminal history related to a "**Jonathan Wayne Jefferson**," whose alias names include "Jonathon Wayne Jefferson"

-14-

advisement. [Trial Tr. vol. II, 493-506, May 6, 2003].

On **May 7, 2003**, this Court gave **notice and warning to the government of its concern as to the multiple complained of aspects of the government's conduct**, including the objected to **government's references in its opening statement to guilty pleas by absent alleged co-conspirators, with full knowledge at least one of those defendants had a pending motion to withdraw his plea; the government's declaration a *James* hearing would not be needed; when, in fact, a *James* hearing was needed; the government's failure to comply with the Magistrate Judge's ruling and order of one year earlier; as well as the government's alleged failure to identify the unindicted co-conspirators who would testify at trial, in any fashion; the government's having provided what information was provided as to witnesses only one week before the May 2003 trial - *nearly one year after*** Magistrate Judge Hills's **May 21, 2002 Order** directing the government to disclose the names of unindicted co-conspirators who would be expected to be called as witnesses "as soon as practicable" and "to supplement" that disclosure - **coupled with** the government's calling an unidentified, unindicted co-conspirator to testify as to another unindicted co-conspirator's statement, in light of its failure to comply with Magistrate Judge Hill's 2002 Order and this Court's order as to *James* hearings. [Trial Tr. vol. III, 510-555, May 7, 2003]. This Court specifically noted, **the government had argued in its opening statement, five of the ten co-defendants had pled guilty or intended to plead guilty, when the government had knowledge**

---

and "Jonathan **W.** Jefferson"[Crim. No. 06-60059, Doc. 88-3, Exh. C].

It is noted AUSA Clemons states in his affidavit that the attorney for Telly Gallien later indicated in 2006 that he received the 302 from the government. Assuming the 2006 assertion of the AUSA accurately reflects events in 2003, when the attorney for Telly Gallien stated on the record he in fact did *not* receive the 302, the government nevertheless, has not accounted for the attorney on behalf Sidney Gallien continuing to assert she did not receive the 302 prior to the May 2003 trial.

**at least one of those five co-defendants specifically referenced by the government as having "pled," had filed a *motion to withdraw* his plea *prior to* opening arguments**.

The Court, also, noted on the record, as to the now apparent necessity of a *James* hearing and the government's omission and failure to comply with its scheduling order requiring notice of the need of a *James* hearings, if anticipated, particularly in light of defendants' often declared theory of their defense:

> The Court:  If you look at *U.S. v. Bolla*, 685 F.2d 929, the Court finds ..., "to protect a defendant from admission of prejudicial hearsay on the basis of threadbare evidence of conspiracy, the judge must decide **at the conclusion of a *James* hearing** whether the independent evidence linking the defendant to the conspiracy is substantial.  If a co-conspirator's prejudicial declaration is admitted into evidence, the judge must reconsider its admissibility at the conclusion of the trial. The Fifth Circuit takes it very seriously.  In making its determination at the conclusion of trial, the government standard is higher than that applied in the *James* hearing, i.e., whether the prosecution, through independent evidence, has demonstrated **the defendant's participation in the conspiracy** by a preponderance of evidence.
>
> So, it was clear that if we were going to start putting in evidence of co-conspirators, that in all likelihood, a *James* hearing would have been needed.  Now that having been said, particularly in light of the . . . joint status report, and this Court's Scheduling Order in a criminal matter, as soon as it became apparent that this was going to be needed, it should have been brought to the Court's attention.

[Trial Tr. vol. III, 510-511, 581, May 7, 2003]  (emphasis added)

When questioned as to the government's failure as of *May 2003* to comply with Magistrate Judge Hill's *May 2002* Order, the AUSA replied:

> What I was saying, Your Honor, Judge Hill ruled on May the 21st, which the ruling is already in the court, that the government shall provide **the witness list** or **the list** of coconspirators [sic] that will testify on behalf of the government, and he said provide it **as soon as practicable** and **continue to disclose**.
>
> The trial was continued subsequent to that, Your Honor.  I don't recall the exact date.

No witness lists were formulated at the time that the trial was continued. The government - - **or I simply forgot about Judge Hill's order**.

[Trial Tr. vol. III, 552, May 7, 2003](emphasis added).

Defendants argued extreme prejudice, and for reasons stated on the record, this Court granted

the defense motions for mistrial, noting:

The Court: The government **was ordered** in fact **by Judge Hill to name those unindicted co-conspirators that they intended to call at trial in May of last year. They did not ever fully formally comply with Judge Hill's Order.** They did, however, at some point in time indicate informally which ones they felt would testify and which ones they felt would not testify,[17] but in so doing **did not identify *Jonathon* Jefferson as the same *Wayne* Jefferson in the 302s that had already been given** and that indicated that in fact he was a supplier. So, they had not complied with the spirit of Judge Hill's Order. **Nor did the government** in filling out the joint status report **indicate to the Court, as is an Order of this Court in its standing order in criminal matters, that in fact if evidentiary hearings are going to be needed, that they should notify the Court. The government's answer to that question was, "no," notwithstanding the government's likely intention to use unindicted co-conspirator testimony and to present in its opening statement the fact that five of the nine originally indicted parties had in fact pled guilty, when in fact one of those parties was not going to testify and had made that known.**

Those matters create unique circumstances . . . to the point where I feel prejudice has been experienced by all of the defendants in their preparation of the case, their ability to defend the case, and the information that has been presented to the jury, in particular, about unindicted co-conspirators . . . .

So with that, I think my record is complete. Let's go ahead and bring the jury in. I'm going to dismiss the jury. Please do not leave when we finish, ladies and gentlemen, **because upon finishing we will reschedule this matter for trial if the government intends to retry**.

---

[17] Defense counsel deny the AUSA informally identified which of the listed witnesses were unindicted co-conspirators who the government anticipated would testify, thus, illustrating the necessity for the government to have properly complied with the order of the Court and provided "the list" as the AUSA admits was ordered by Magistrate Judge Hill, rather than allegedly engaging in an informal discussion with defense counsel. Thus, the government's argument, at best, only begs the question.

[Trial Tr. vol. III, 582-583, May 7, 2003] (emphasis added)

**After the May 7, 2003 declaration of mistrial** and having **rescheduled the trial for May 19, 2003 at 9:30 a.m.,** this Court **scheduled the** *James* **hearing** for **later** *that same afternoon.* **When the parties re-convened for the** *James* **hearing, the government indicated the hearing would not be necessary:**

> Mr. Clemons: But anyway Your Honor, **the government does not intend at this point to introduce any co-conspirator statements pursuant to Federal Rules of Evidence 801(d). The government went through the witnesses' interviews and 302s with my agents over the break[,] of those witnesses that we thought possibly would be providing co-conspirator statements, and we've made the decision that, based on the statements we're aware of at this point, we don't intend to introduce any of those statements, and therefore the government sees no need for a hearing at this point because there are no statements that I can advise them I intend to introduce.**[18]

[*James* Hearing Tr., pp. 5-6, May 7, 2003] (emphasis added)(punctuation added for clarity). Thus, after mistrial had been declared, the jury dismissed, and the next trial set for May 19, 2003, the *James* hearing commenced. The *James* hearing **was in preparation for and in anticipation of the May 19, 2003 trial**. However, on **May 7, 2003,** at the opening of the *James* hearing the government asserted in **open court** they had made the conscious decision **not to introduce "any co-conspirators statement pursuant to Federal Rule of Evidence 801(d),"** as to the only trial at issue at that point, the scheduled, future trial. **Based upon the government's assurance, the** *James'* **hearing was terminated.** The government's assertion could, at that post-mistrial juncture, have related only to and referenced only their intent **as to the upcoming trial**. At no time prior to

---

[18] It should be noted the government made this assertion **in open court** when the motion for **mistrial had already been granted and the trial re-scheduled.** The *James* hearing thus, was commencing **in anticipation of the May 19, 2003 trial,** and the *James* hearing would have had **relevance only to an upcoming trial,** the previous trial already having been abated by mistrial. Thus, the assertion would apply to the **future** trial.

commencement of the subsequent trial did the government notify the Court or defendants their position had shifted, yet the government acted in direct contradiction to that assertion when the matter next went to trial.

As noted, on May 7, 2003, trial was **reset for May 19, 2003**. [Doc. 325] The **Court also, ORDERED the government to "supplement *in writing* its response to the court's order to provide defendants with full names of any unindicted co-conspirators that will be offered as witnesses in this matter *by noon Monday, May 12, 2003*."** [Doc 328](emphasis added). All defendants moved to dismiss the indictment on Double Jeopardy grounds. [Docs. 322, 330, 338, and 341] The motions were opposed by the government. On **May 12, 2003**, the government provided a document to defendants entitled **Government's List of Unindicted Co-Conspirators it Intends to Call as Witnesses** listing **eighteen names**. The government **did not file the list into the record**.

On **May 14, 2003**, this Court denied defendants' motions to dismiss the indictment [Doc. 344], and defendants filed **Notices of Appeal**. [Docs. 362, 367, 368, 369] As this Court was divested of jurisdiction pending a ruling by the Fifth Circuit, **the trial date was continued without date pending the Fifth Circuit's resolution**. [Doc. 366]

During the pendency of the appeal, Celestine filed a **second Motion for Reconsideration of Magistrate Judge Hill's Detention Order**.[19] [Doc. 375] The government, again opposed. Celestine averred he was a model prisoner, an active member of a program bringing incarcerated parents into regular contact with their children. Celestine, who indicated he was a life-long resident of Lafayette Parish, advised he had been incarcerated for **18 months** and desired to seek employment in order to provide for his children and otherwise spend time with his children, one of whom would

---

[19] This was Celestine's second motion for reconsideration of Magistrate Judge Hill's January 31, 2002 Detention Order but, his *third request* to be released from detention.

be graduating from high-school. **As noted, the government opposed the motion** [Doc. 376]; the motion was denied on August 6, 2003 by Magistrate Judge Hill, who considered testimony and letters written by Celestine's family members on Celestine's behalf. [Docs. 389, 392]

On **February 3, 2004, the Fifth Circuit affirmed** this Court's denial of the motions to dismiss the indictment [Doc. 397]; **mandate was issued on February 26, 2004.** [Doc. 398] This Court **reset the trial date for May 3, 2004.** [Doc. 399] A new Criminal Scheduling Order issued, again noting, "If it is determined that the trial date violates the Speedy Trial Act, a motion to reset the trial shall be filed immediately." [Doc. 400]

On **March 24, 2004,** the parties advised the trial would last beyond the time allotted. Therefore, this Court **reset the trial date to a Special Fixing on October 4, 2004.** [Doc. 407]

On May 4, 2004, **Sidney Gallien filed a Motion to Adopt the Motion for Bill of Particulars filed by Celestine.** [Doc. 422] On **May 7, 2004,** Sidney Gallien's Motion to Adopt the **Motion for Bill of Particulars was Granted.** [Doc. 422]

On **September 8, 2004,** the parties attended a **Pre-Trial Conference** where the following colloquy ensued between the Court, counsel for the government and counsel for Celestine:

| | |
|---|---|
| The Court: | All right. I'm assuming that the list of the unindicted co-conspirators, we don't have an issue in any fashion with that at all, correct? |
| **Mr. Clemons:** | **That's been provided.** |
| The Court: | That's not my question. My question is I'm assuming we have no issues with that from anyone here is that correct? |
| Mr. Boustany: | We don't have an issue as far as them providing it . . . but **there's an issue about the conspiracy itself** and I think – the issue that I have is that **the government specifically changed the indictment. They have subtracted some people and seem to add some people. And the issue I have is that the Grand Jury indicted for** |

**this one indictment and we are going to ask that the original indictment, that the government be limited to the original indictment.**

[Pre-trial Conference Tr., 3, Sept. 8, 2004] (emphasis added). The Court noted the **issue of the government's shifting position as to the indictment had been raised in the 2003 Pre-Trial Conference, and in response the government, in writing, had notified defendants that it "anticipates the dismissal of the Continuing Criminal Enterprise charge" as found in Count Two of the Indictment.** [Doc. 356, p. 2, ¶ 2] **However, at the September 8, 2004 Pre-Trial Conference, the government, without prior notice, shifted its position and asserted it had not "made the final decision yet," as to the continuing criminal enterprise charge, notwithstanding its earlier assertion.** [Pre-trial Conference Tr., 4, Sept. 8, 2004] **The defendants argued, again, that the government was ever shifting "the chase," the charges, and the make-up of the particular conspiracy as charged and consequently, they could not adequately prepare their defense.** The Court **ordered the government to declare** its intentions as to the continuing criminal enterprise charge on or **before noon on September 15, 2004.** [Doc. 433][20]

On **October 4, 2004,** this matter once again proceeded to trial. [Doc. 455] On the fourth day of trial, the Assistant U.S. Attorney attempted to rehabilitate government witness and co-defendant Arthur Ray Charles with a transcript of an earlier interview of Charles by agent "Perez" ("the Perez statement"); all **defense counsel objected,** arguing **they had not been provided a copy of the transcript of the Perez statement about which the witness was being questioned, notwithstanding their repeated requests, and the government's repeated assertions all such**

---

[20] In correspondence filed into the record on **9/27/04,** the government advised it "wishes to maintain and prosecute Count Two...," (**however, this Courts notes the letter internally references the September 10, 2004 minute entry, yet itself is dated March 5, 2004 some six months before the minute entry to which it is arguably in response**).

material had been presented. **Defendants, also, argued the government's repeated failure to disclose the existence of any such statement**. After the jury was excused, and on further questioning by the Court, **it became apparent the government had failed to disclose or provide the disputed transcript to defense counsel, notwithstanding repeated requests from defense counsel and repeated assertions to the contrary by the government. The government admitted its failure** and explained the failure was **due to a "communication problem" between the AUSA and the case agent**. Nevertheless, it was **not disputed the defendants, in fact, had not received the information they had requested on numerous occasions** and the government had used that information to rehabilitate their witness. Upon review of the document, the Court suggested certain information within the document was "flat out, straight up, hammer on the nail exculpatory as to certain of the defendants."[21] Defendants argued **surprise** and **prejudice** as **they had relied on the government's responses to their discovery requests and prepared their defenses accordingly, and thus, moved for a Mistrial**. This Court, again, **GRANTED** defense motions for a mistrial and noted:

> The Court: And all of that having been said, this Court said the last time that **the government was to make absolutely certain that in fact the defense had everything they were due when they were due it.** This Court would suggest that in a situation such as that, if not in normal practice, but certainly in a situation such as that, it would be prudent to physically sit down with the defense counsel and say, "this is what I have, do you have it?" Otherwise, you risk exactly what happened here happening, and **that argues for very poor practice.** I do not know. Cannot speak to it. I merely make the suggestion.
>
> Now does this Court find bad faith on the part of the government? No.

---

[21] This Court's discussion with respect to exculpatory material primarily focused on statements made by Charles related to Telly Gallien. However, after a cursory review of the transcript as it related to the *other* defendants, this Court noted that, "it is not the classic exculpatory, but gentlemen, Mr. Charles is not your classic witness." [Trial Tr. vol. V, 1125-1128, October 8, 2004]

Mr. Clemons makes exactly the same point that came to the mind of the Court. First, it is the *defense*, among all the defense counsel, who were if I would say somewhat unhappy with this jury.

\*     \*     \*

The government indicated no problem with this jury. But the defense counsel, particularly Mr. Dauphin, had a problem with this jury and the makeup of the jury. The government did not.

Additionally, the government, as Mr. Clemons pointed out, is the party that in fact brought the statement up. If it had been done deliberately or intentionally to hide it from them, Mr. Clemons wouldn't have waited. He's not that foolish.

Now, does this Court find the actions of the government, however, were done in order to goad the defendants into asking for a mistrial? No. The government in this Court's opinion does not want a mistrial. Am I correct, Mr. Clemons?

Mr. Clemons:   That's correct your honor.

The Court:   I thought so. The government does not at all want a mistrial. In fact, if someone wishes a mistrial in this matter, the Court would suggest it's probably the defendants who are smiling because they don't like this particular jury. Not that they don't like the jury, the makeup of the jury is not one they would have necessarily selected had they had other choices.

**So, I do not believe, nor has this Court, in talking with Agent Pisano in open court before I left, in reviewing all of this, do I find that the government acted intentionally. Perhaps with poor practice, but not intentionally**.

[Trial Tr. vol. V, 1128-1132, October 8, 2004](emphasis added). Thereafter, defendants again moved to dismiss the indictment for Double Jeopardy violations; however, the motions were again denied. [Doc. 461]. Thereafter, defendants filed Notices of Appeal. [Docs. 458, 465, 467, 470 and 471] The **defendants** also **moved** to stay this matter pending appeal. This Court heard arguments, considered relevant jurisprudence and granted the motion to stay, **finding that: (1) defendants had**

**the right to appeal; (2) there was a legal basis to the defendants' appeal on Double Jeopardy grounds; (3) the Fifth Circuit could disagree with this Court's findings as to the motions to dismiss; and (4) defendant's appeals were not "frivolous."** *See* Trial Tr. vol. V, 1156-1163, **October 8, 2004**.

On October 8, 2004, Celestine advised he again, would be seeking an appeal of his detention. This Court advised counsel for Celestine that, in view of this "other matter" related to Charles's testimony, it was unlikely this Court would grant a motion to reconsider Magistrate Judge Hill's Detention Order requiring Celestine to remain detained pending trial:[22]

| | |
|---|---|
| Mr. Boustany: | Your Honor, I did. I discussed it with George, and he does want to pursue the appeal. |
| The Court: | Okay. Now understand, Mr. Boustany and your client understands **that the likelihood is he will remain in jail until that appeal has gone up and come back down.** |
| Mr. Boustany: | I do your honor. Now we may file a motion to reconsider his detention, and it can be heard at that time, but – and I've explained that, you know it may or may not be heard, and he may have to stay in until the appeal is resolved, but he feels fairly strong about the issue, and I cannot disagree with him. |
| The Court: | Okay. Now, with that having been said, he needs to understand that, even on the motion to reconsider, **based upon what happened in the other matter**, okay, the likelihood is I probably would not grant him release at this time.[23] |

[Trial Tr. vol. V, 1143-1148, October 8, 2004] (emphasis added).

---

[22] It is noted that Charles had informed the Court both through his counsel and personally, that Celestine had made "death threats" against Charles.

[23] *See* note 22 *supra.* Also, of interest, when counsel for Celestine noticed his intent to appeal this Court's denial of his Motion to Dismiss, the Court specifically discussed the likelihood Celestine might remain in detention pending appeal. [Trial Tr. vol. V, 1142-1143, October 8, 2004]

Celestine, in fact, did file a third Motion for Reconsideration of Magistrate Judge Hill's original Detention Order. Celestine again averred he was a model prisoner, an active member of a program bringing incarcerated parents into regular contact with their children. Celestine, who indicated he had been **incarcerated** now for **35 months**, advised his father recently died and he would like to seek employment to provide for his child. [Doc. 459] Again, the government opposed the motion [Doc. 468].

On **November 4, 2004**, Magistrate Judge Hill held a **detention hearing**. [Doc. 473] Gilbert Paris, a Lafayette Parish Sheriff's Office (LPSO) deputy appeared **pursuant to subpoena issued by counsel for Celestine** and testified he oversaw inmates at the Center and Charles and Celestine were paired together in work groups and Charles had in no way indicated fear of Celestine.[24] [Doc. 473]

On February 9, 2006, the Fifth Circuit affirmed this Court's denial of the motions to dismiss for double jeopardy violations; Judgment was issued as **Mandate on March 3, 2006**. [Doc. 489] This Court issued a Minute Entry **resetting trial for June 26, 2006**, noting:

> **Counsel were strongly cautioned by the Court to ensure that all preparations for trial (such as the issuance of subpoenas, etc.), as well as all disclosures (such as production of discovery, Jencks material, notices, etc.) are completed in a timely manner and as required by law. In light of the extensive and colorful history of this case, this Court has a heightened expectation that, *by the time trial commences, all parties and counsel will have complied with all of their duties of production, notice, disclosure, etc.***

[Doc. 493](emphasis in original).

---

[24] The Court later learned the government's case agent inappropriately contacted the sheriff's department to question why the sheriff's office allowed Paris to testify "for Celestine." The matter involving the case agent's contacting the sheriff's department as a result of Paris' testimony will be further dealt with separately once all defendants have been tried.

The foregoing Minute Entry was the *third* time the government was admonished to make full pretrial disclosures, including full disclosure of those unindicted co-conspirators the government intended to call as witnesses.

On **May 10, 2006**, at a meeting of all counsel, the government submitted to defendants a document entitled "**Government's Witness List - Alphabetical Order**" containing some **eighty** names; this list was **not filed into the record by the government**. It ultimately came to the *Court's* attention only as an exhibit, Government Exhibit 1, during the June 26, 2006 trial. The list contained no indication or delineation which of the eighty witnesses might be the unindicted co-conspirators intended to be called at trial; the government's previous disclosure of unindicted co-conspirators they intended to call at trial, presented to defendants in 2003 contained only 18 names and the two lists overlap inconsistently. Thus, the government's intentions as to unindicted co-conspirators, became even more difficult to discern. As the government, also, had not filed into the record the "Government's List of Unindicted Co-Conspirators it Intends to Call as Witnesses" which was provided to counsel by correspondence on May 12, 2003, **the record did not reflect** the **government's compliance** with Magistrate Judge Hill's 2002 Order or this Court's May 2003 Order. Rather, the first reference to either list *within the record* came by way of the June 26, 2006 trial. The "Government's List of Unindicted Co-Conspirators it Intends to Call as Witnesses" was filed under seal on June 26, 2006 as record document 549 and the "Government's Witness List - Alphabetical Order" was presented as Government Exhibit 1 in open court.

On May 11, 2006, the parties submitted their Joint Status Report, in which Celestine specifically noted he had "**admissibility questions about any drug activity allegedly involving himself and anyone not claimed to be part of the alleged conspiracy for which the Grand Jury**

indicted" and about "**any drug activity allegedly involving Celestine and any alleged co-conspirator whose activities involve some other alleged conspiracy for which the Grand Jury indicted**." Thus, Celestine continued to remain steadfast in his position there existed no conspiracy, as charged by the government, in which he had been a participant, and again, put the government on notice as to that position. Celestine's counsel added:

> This defendant objects to any substantive amendments of the indictment by the government. This defendant wants the Government limited to proving the conspiracy alleged in the indictment **by those defendants *named* in the indictment who were allegedly part of the conspiracy. This defendant objects to any attempt by the Government to substantively change the indictment by alleging or proving a different conspiracy with different people or during a different time period**.

[Doc. 507] (emphasis added).

**Soon after, this Court was contacted by counsel for defendant Celestine, requesting an immediate hearing alleging "questionable conduct by the government**." Counsel for defendant Celestine averred the **government's case agent had contacted someone within the Lafayette Parish Sheriff's Office ("LPSO") concerning Paris's testimony at Celestine's November 4, 2004 detention hearing and that certain actions were taken within the LPSO against Paris, as a result of Paris's testimony**. A **May 18, 2006, evidentiary hearing** was conducted, where **this Court expressed extreme concern over the actions of the government's case agent and the possible chilling effect that agent's actions might have on the willingness of LPSO employees to testify in the future**. The Court ordered members of the LPSO into Court to testify as to what occurred and received **internally inconsistent testimony** by members of the LPSO with respect to what took place within the LPSO following Mr. Paris's testimony at the detention hearing. The **government argued ignorance of their case agent's actions**, and innocent intent. The matter is

not yet fully resolved. [25]

On **May 26, 2006**, the parties attended the **third Pre-Trial Conference** with the Court. At that time, **multiple members of the United States Attorney's Office attended the conference** wherein **possible sanctions were discussed as a result of the AUSA's attitude, disregard for Judge Hill and this Court's orders, and the collective objectionable conduct of the AUSA**. This Court noted:

> The Court: Well, as I said, Mr. Washington [U.S. Attorney Don Washington], it's not something this Court would do lightly, and as I think you know, I have great respect for you and for your office and I like Mr. Clemons, but he is getting me to the point where I am being convinced, not just from what happened in this case, but what's happened in Clark, that if it's important to him, it's one thing. If it's not, that's another entirely.
>
> So the point I'm making as to the discussion is that, **if you take any one of the individual matters, yes, perhaps it can be explained or rationalized, or the other guy didn't do it, too, kind of thing, but when you take the collective, it becomes problematic, and when you add to it Clark, it becomes doubly problematic.**
>
> **So, that having been said, I want to give the government full opportunity to give considered thought to its responses to the briefing on sanctions and -- remedy, rather, and the motion to dismiss because I am giving same considered thought.**

Pre-trial Conference Tr., pp. 3, May 26, 2006.[26] (emphasis added). No sanctions were imposed at that time.

At the **May 26, 2006 Pre-Trial Conference**, the possible conflict of interest of defense

---

[25]This matter will be taken up more fully by this Court following the conclusion of the trial in order to avoid any possible further chilling effect.

[26] AUSA Clemons was, also, before the Court in *USA v. Clark*, Docket No. 02-60049 and in that matter also, failed to comply with multiple orders of the Court.

attorney Garrett was *again* raised.[27]  **Ms. Garrett argued she had attempted to comply in 2003,**

**however, without knowing the identity of the government's trial witnesses, and** *in particular*

*the unindicted co-conspirators the government intended to use in order to prove the existence of*

*the disputed conspiracy,* **and to what and about which defendant they might testify, given her**

**broad criminal defense practice, she could not effectively comply and she remained concerned**

**she might have a conflict of interest which would not be apparent until trial.  This knowledge,**

**notwithstanding previous orders of the Court, was possessed <u>only by the government</u>.  And,**

**of course, if other unindicted co-conspirators were added by the government, she argued, as**

**the government had done repeatedly, her problem would become even more acute.  As the**

**identity of the unindicted co-conspirators the government intended to call to testify as to which**

**defendant's participation in the alleged conspiracy, was information known <u>only to the</u>**

**<u>government</u> – this Court, that day, ordered the AUSA to inquire of its witnesses, whether they**

**had been represented in the past by** *Ms. Garrett* **and if so, to notify Ms. Garrett** *"not right*

*before trial.  So* ***within the next seven days*** **accomplish that."** [Pre-trial Conference Tr., 4, May 26,

2006] (emphasis added)  **The government did not do so.  Rather, the AUSA, again, blatantly**

**failed to comply with an order of the Court.**  The government failed, with full knowledge that if

Ms. Garrett were to have a conflict and were to have to recuse, **the opportunity for trial would,**

**again, be lost.**  Yet, **the government blatantly failed to comply.**  As a result, as the trial

approached, on the "Thursday or Friday" before the June 26, 2006 trial, Ms. Garrett argues **she was**

_____

[27] This matter was first raised **by Ms. Garrett** at a telephone status conference on **April 30, 2003,** wherein
this Court ordered **the defense counsel** to determine if a conflict existed based upon those unindicted co-
conspirators and/or witnesses the defendants believed the government might call at trial and if so, to determine if the
conflict could be and would be waived.

forced to set aside *her trial preparation* and go "tearing out to Breaux Bridge," Louisiana, to *attempt* to locate *possible* witnesses she *believed* might testify in *hope* of independently confirming whether or not she *might* have a conflict with those government's witnesses *of which she was aware*. [Trial Tr. vol. I, 17-26, June 26, 2006] (emphasis added) **The government's trial preparation was not so impacted.** The government's failure **worked to the government's advantage** and **to the defense counsel and defendants' detriment,** by removing Ms. Garrett from trial preparation while leaving the government to theirs.[28]

Shortly before the upcoming trial date, all defendants again **moved to dismiss the indictment pursuant to alleged violations of the Speedy Trial Act.** [Docs. 541, 542, 544, 545, 548]. Sidney Gallien, also, **filed a motion to continue the trial date due to *possible conflicts of interest* between Sidney Gallien's counsel and certain trial witnesses.** [Doc. 546]. On June 23, 2006, after full hearing in open court, the motions to dismiss the indictment and to continue the trial were denied. [29]

On **June 26, 2006,** trial commenced *for the third time*. **On THE MORNING OF TRIAL, the government filed under seal a document entitled "Government's List of Unindicted Co-Conspirators it Intends to Call as Witnesses."** [Doc. 549] The government listed **23** unindicted

---

[28] The AUSA later admitted he "just had not written down in his notes" the Court's Order, and thus he had not complied. It should be noted the AUSA was not the only representative of the U.S. Attorney's office present at the pre-trial conference. [Trial Tr., vol. I, 80-81, June 26, 2006]

[29] This Court would be remiss if it did not comment on the lack of preparation by the AUSA at that hearing. Notably, at the hearing on the motions to dismiss, the AUSA admitted *he had not read* the two *pivotal* cases *upon which he relied in arguing his opposition* to the motions to dismiss. [Doc. 563] Additionally, the AUSA has repeatedly cited incorrectly to multiple records. For example: in the AUSA's objections to the Report and Recommendation issued by Magistrate Judge Hill, the AUSA erroneously cites to the October 5, 2004 Trial Transcript at pages 6, 7, 8, 9 and 10 for the language referenced. No such reference is found at the noted cites. After diligent inquiry, *the Court* determined the reference is found in the May 5, 2003 Trial Transcript at pages 6, 7, 8, 9 and 10.

-30-

co-conspirators that it intended to call at trial – **having on the morning of trial added six additional unindicted co-conspirators**[30] **to their May 12, 2003 list of unindicted co-conspirators,** and **three of those witnesses**[31] **had** *never before been disclosed* by the government on any purported listing. The **morning of the third trial** was the *first time the government had disclosed* to the defendants *six additional persons it alleged to be unindicted co-conspirators they anticipated they would call at trial*, despite *three* Orders of Court, namely: (1) Magistrate Judge Hill's **May 21, 2002 Order** requiring the government to disclose the names of the unindicted co-conspirators it intended to call at trial and to supplement that disclosure; (2) this Court's **March 7, 2003 Order** to disclose same; and (3) this Court's subsequent **March 3, 2006 Order** to disclose same. Thus, (on the morning of trial) the government **after some four years, three orders of the Court, and** *having begun three separate trials*, **purported to comply** with the Order ensuing from the **defendant's Motion for a Bill of Particulars** by supplementing their list by **adding six witnesses** to the "List of Unindicted Co-conspirators it Intends to call as Witnesses," as well as three witnesses heretofore not identified on any of the government's previous submissions. By waiting **until the morning of trial**, the government had **granted no meaningful notice to defendants**, thus, **robbed defendants of their ability to adequately prepare their defense**, even if only as to those witnesses.

    **All four defendants objected; argued prejudice**; and ultimately **Moved for a Third Mistrial**, citing the government's dilatory "morning of trial" disclosure. The following colloquy ensued:

    The Court:    Uh huh. And **this Case has been going on for four years, and**

---

[30] Andre Bullard, Samuel Charles, David Heard, Chris Lewis, Billy Mitchell and Delana Wilson.

[31] Andre Bullard, Chris Lewis and Billy Mitchell.

you're alleging a conspiracy, and on the morning of the third trial, notwithstanding this Court's Order that you give them a list of all unindicted co-conspirators as far back as probably the first trial, because it played in the mistrial, if I'm not mistaken, you just now on the morning of trial are adding three new unindicted co-conspirators, correct?

Mr. Clemons: **That is correct, judge.** And these are people I didn't intend to call, but at the same time I wanted to err on making – since they were under subpoena or writ, I wanted to make sure the defense was aware of those people.

The Court: Uh-huh. **Why didn't you do it before now, Mr. Clemons?**

Mr. Clemons: **Your Honor,** *IT WAS ONLY THIS WEEKEND WHEN I REALIZED THAT THESE NAMES WERE NOT ON THE LIST.*

The Court: **Oh, so you realized this weekend you** *had messed up* **and had not put them on the list before now. Is that what you're telling me?**

Mr. Clemons: **Right.** We didn't have those witnesses when we made the first list.

[Trial Tr. vol. I, 11, June 26, 2006] (emphasis added). **Thus, by his own admission the AUSA "had forgotten" about Magistrate Judge Hill's Order, had "communication problems" with his case agent, had "not put the Court's Order in his notes and thus, had not complied; and now had "messed up." Thus, as of the third attempt to bring this matter to trial, the AUSA's conduct again, had impacted the ability to take the matter to trial.**

On **June 26, 2006**, upon consideration of the arguments made, this **Court granted,** *for the third time,* a mistrial, again due solely to the government's failure. [Doc. 568]. On **June 27, 2006, this Court gave full and complete oral reasons for granting the mistrial,** citing all prior relevant entries of the records and the procedural history. In giving its reasons on **June 27, 2006,** this Court read directly from the records of **the various trials and conferences,** including the

-32-

following language from the **May 7, 2003 trial:**[32]

> The Court: Now, this is in **May 7, 2003**, the magistrate judge's ruling having been issued on **May 21, 2002.** I'll pick up again. **'No, you did not. You never gave them a listing of the unindicted co-conspirators that you intend to call at trial, and that's what he ordered you to do. There is a difference, Mr. Clemons, between giving them a list of all the witnesses you intend to call and giving them a list of the unindicted coconspirators you intend to call at trial. You never did that.'**

[Trial Tr. vol. II, 105, June 27, 2006] (emphasis added)

This Court further explained on the record in open court on **June 26, 2006:**

> The Court: Four good defense lawyers put it on the record that they could not grant an adequate defense for their clients **because of the government's actions** if they were forced to continue through with this trial in the posture as it stood at that point, **and the government has added at least three names to a list that had been ordered to be provided four years earlier, and their failure to comply with their obligation as to that list in the first trial led directly to a mistrial.**
>
> At that point at 8:30 last night, it became perfectly clear to this Court there was no way to salvage this matter. That is the reason I granted a mistrial.
>
>            \*        \*        \*
>
> Now it should be noted and it should not be lost that **the defendants play no role in this particular conundrum in which we find ourselves. This conundrum sits at the feet of the U.S. Attorney's Office, unfortunately, as to why we are in this particular conundrum.**

[Trial Tr. vol. II, 135, 205, June 27, 2006](emphasis added)

Thereafter, **the government moved the Court to reconsider the granting of the mistrial; however, ultimately, the government withdrew its Motion to Reconsider, in favor of a Motion**

---

[32] For a full text *see* Trial Tr. vol. II, 89-218, June 27, 2006.

to Dismiss the Indictment Without Prejudice. Over defendants' objections, arguing the dismissal should be with prejudice, this **Court GRANTED the Motion to Dismiss** the Indictment without prejudice. [Docs. 570]; [Trial Tr. vol. I, 206-207, 209, June 26, 2006]. **Defendants did not appeal**.

In open Court, Celestine filed his *fourth* **Motion to Reconsider Detention**. [Doc. 550]. This Court orally granted the motion on June 27, 2006, and noted that as the indictment had been dismissed, there was no legal basis for detention.[33] Thus, on June 27, 2006, the night of the **third mistrial, Celestine was ultimately released, having been detained for *four years five months* and never having been brought to trial**. [Docket Entry, 6/27/06]. Oral Motions to Remove Bond and Conditions of Pre-trial Release were filed by Sidney Gallien, Telly Gallien, and Travis Gallien; the Motions were granted on June 27, 2006. [Doc. 570].

On **September 15, 2006**, defendants were re-indicted in the present matter [Crim. No. 06-60059]. Trial was **set for December 5, 2006**. [Doc. 44].[34] Each defendant moved for dismissal of the indictment with prejudice. [Docs. 64, 74, 75, and 76]

## MOTIONS TO DISMISS INDICTMENT

All defendants have filed Motions to Dismiss the Indictment with prejudice; Celestine, Sidney Gallien and Telly Gallien filed their motions on November 17, 2006, and Travis Gallien filed his motion on October 24, 2006. All motions were referred to the Magistrate Judge for Report and Recommendation.[35] The Magistrate Judge recommended this Court grant Celestine's Motion to

---

[33] It also, was noted by the government, that with the government's dismissal of the indictment, there was no basis for the government to urge Celestine's further detention.

[34] For the purpose of discussion, this docket entry number and those which follow refer to entries related to Criminal No. 06-60059, unless otherwise noted.

[35] This Court is not of the habit of referring dispositive or substantive matters to the magistrate judge for report and recommendation. However, given the extended and unique history of this matter, the Court felt a review

Dismiss with Prejudice and deny Travis Gallien, Telly Gallien, and Sidney Gallien's Motions to Dismiss. George Celestine, Travis Gallien, Sidney Gallien and the government have filed objections to the Magistrate Judge's Report and Recommendation. This Court will address the motions to dismiss by way of a review of the objections filed by the government and the defendants.

**Mr. Celestine** argues in his Motion to Dismiss Indictment [Doc. 75], that the charges against him must be dismissed for three reasons, namely: (1) under the Speedy Trial Act, 18 U.S.C. § 3161, the government has not met its burden of timely bringing the case to trial, and there have been no specific findings by this Court that prior continuances served the "ends of justice;" (2) pursuant to FED.R.CRIM.P. 48(b), this Court may dismiss an indictment if unnecessary delay occurs in bringing a defendant to trial;[36] and (3) the letter and spirit of the Double Jeopardy prohibitions of the United States Constitution have been violated by the Government's actions in this case. [Doc. 75-2]. The government opposes the motion [Doc. 79].

In **Sidney Gallien's** Motion to Dismiss Indictment [Doc. 76], Sidney Gallien argues the indictment should be dismissed pursuant to the Double Jeopardy clause of the United States Constitution urging prosecutorial misconduct.

In **Telly Gallien's** Motion to Dismiss Indictment [Doc. 74], Telly Gallien argues the

---

by another judicial officer would be beneficial, thus, referred it to the magistrate judge for report and recommendation.

[36] Rule 48(b) provides:

    (b)    **By the Court:** The court may dismiss an indictment, information, or complaint if unnecessary delay occurs in:

        (1) presenting a charge to a grand jury;
        (2) filing an information against a defendant; or
        (3) bringing a defendant to trial.

FED.R.CRIM.P. 48(b)(West 2007).

indictment should be dismissed pursuant to the Double Jeopardy clause because: (1) the Court should have dismissed the indictment against the defendant for violation of the Speedy Trial Act; (2) the government failed to follow the Court's pre-trial Orders of discovery for a third time after repeated warnings by the Court; (3) the Double Jeopardy clause has been violated because the prosecutor intentionally provoked a mistrial. The government opposes the motion [Doc. 79].

In **Travis Gallien's** Motion to Dismiss Indictment [Doc. 64], Travis Gallien argues the indictment should be dismissed under the Double Jeopardy clause arguing the prosecutor deliberately and intentionally provoked a mistrial. The government opposes the motion [Doc. 79].

On **November 6, 2006, all defendants and the government jointly moved to continue the trial**. [Doc. 70]. This Court granted the joint motion for continuance, finding the case to be complex, and further finding a failure to grant the continuance would likely result in a miscarriage of justice under the Speedy Trial Act, specifically citing 18 U.S.C. §§ 3161(h)(8)(B)(I) and 18 U.S.C. §§ 3161(h)(8)(B)(ii).[37]

On **April 17, 2007,** Magistrate Judge Hill **issued a Report and Recommendation,** recommending the motions of Sidney Gallien, Telly Gallien, and Travis Gallien be Denied and that the motion of Celestine be Granted. All parties except Telly Gallien filed objections to the recommendations by Magistrate Judge Hill. [Docs. 87, 88, 90, 93] The government opposes defendants' motions and objects to eleven factual findings and eight legal conclusions found within the Report and Recommendation. [Doc. 88]. Attached to the government's objections are: (1) exhibits [Doc. 88-3], and (2) a 26-page affidavit signed by AUSA Todd Clemons *dated May 2, 2007*

---

[37] This Court notes, as it did at that time, that the Motions to Dismiss remained pending and before the Magistrate Judge for Report and Recommendation, thus, tolling of the Speedy Trial Act was likely.

[Doc. 88-2], <u>over one month</u> **after** the Report and Recommendation was issued by the Magistrate Judge.[38] Defendants filed no response to the government's objections.

## LAW

**A.    Standard of Review**

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions. 28 U.S.C.A. § 636(b)(1); Local Rule 74.1(B).

**B.    Substantive Law**

**1.    Double Jeopardy**

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671-673 (1982). As a part of this protection, the Double Jeopardy Clause affords a criminal defendant a valued right to have his trial completed by a particular tribunal. *Id.* The Double Jeopardy Clause, however, does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding. *Id.* If the law were otherwise, "the purpose of law to protect society from those guilty of crimes frequently would be frustrated by denying courts power to put the defendant to trial again." *Id.* Where the trial is terminated over the objection of the defendant, the classic test for lifting the double jeopardy bar to a second trial is the "manifest

---

[38] *Magistrate Judge Hill's Report and Recommendation issued on April 17, 2007;* thus, **the affidavit was not timely provided to the magistrate judge for consideration** and is presented *for the first time to the district court within the government's objections to the Magistrate Judges' Report and Recommendation.*

necessity" standard. *Id.* However, in the case of a mistrial declared at the behest of the defendant, "quite different principles come into play," because the "defendant himself has elected to terminate the proceedings against him, and the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause." *Id.*

> In *United States v. Wharton*, 320 F.3d 526, 531-32 (5th Cir. 2003), the Fifth Circuit observed:
>
> In *Kennedy*, the Supreme Court analyzed the "narrow circumstances under which a defense motion for mistrial nonetheless bars a retrial on double jeopardy grounds." The *Kennedy* Court recognized that retrial after a mistrial caused by prosecutorial misconduct may constitute double jeopardy if the government conduct in question was intended to "goad" the defendant into moving for a mistrial.
>
> **In *Kennedy*, the Court made it clear that prosecutorial misconduct alone is not sufficient for a retrial to result in a double jeopardy violation: "Prosecutorial conduct that might be viewed as harassment or overreaching, *even if sufficient to justify a mistrial on defendant's motion*, therefore, does not bar retrial *absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause.*" Retrial is not barred *even where the prosecution engages in "intentional misconduct that seriously prejudices the defendant." Once the court determines that the prosecutor's conduct was not intended to terminate the trial, "that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment...."***

*United States v. Wharton*, 320 F. 3d 526, 531-32 (5th Cir. 2003)(internal citations omitted)(finding defendant had not shown the prosecution affirmatively sought a mistrial) (emphasis added).

### 2. Speedy Trial Act

Generally, the Speedy Trial Act, codified at 18 U.S.C. § 3161, *et seq.*, requires a defendant to be tried within seventy days of his initial appearance in Court. 18 U.S.C. 3161 (c)(1). If a retrial is required, the retrial must commence within seventy days from the date the action occasioning the retrial becomes final. If a retrial is to occur after an appeal, trial is to commence within seventy days from the issuance of the mandate, unless the passage of time makes the retrial within seventy days impracticable, in which case the period is extended to one hundred and eighty days. 18 U.S.C. §

3162(e).

In multiple co-defendant cases, the seventy-day period within which to try a defendant does not commence until the last defendant has made his initial appearance in court. 18 U.S.C. § 3161(h)(7); *United States v. Franklin*, 148 F.3d 451, 455 (5th Cir. 1998). Excludable delays applicable to any defendant are generally applicable to all defendants. *Franklin*, 148 F.3d at 455. The time during which motions are pending before the Court are excluded from the time limitation. 18 U.S.C. § 3161(h)(1)(F); *United States v. Kington*, 875 F.2d 1091, 1009 (5th Cir. 1989)("Pending motions will toll the trial clock indefinitely; there is no independent requirement that the delay attributable to the motions be 'reasonable'"); *cf. United States v. Johnson*, 29 F.3d 940, 943 n.3 (5th Cir. 1994) (within the Speedy Trial Act context, whether certain delays are excludable does not depend simply on pending motions; rather a court must look into the particular circumstances of that motion, *e.g.*, whether there was a hearing on the motion, or whether the motion was taken under advisement, to determine whether certain delays are excludable).

A defendant may waive the Speedy Trial Act, by among other things, failing to move for dismissal prior to trial; however, a defendant may not prospectively waive the application of the Speedy Trial Act. *Zedner v. United States*, 126 S.Ct. 1976, 1985 (2006); 18 U.S.C. § 3161(a)(2).

### 3. Sixth Amendment Right to a Speedy Trial

The Sixth Amendment states, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...." U.S. Const. amend. VI. In *Frye II*, 489 F.3d at 209-210 (5th Cir. 2007), the Fifth Circuit noted that alleged Sixth Amendment speedy trail violations are reviewed under a four-factor balancing test developed by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972). Those factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's

diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay. *Frye II*, 489 F.3d at 209-210 (citing *United States v. Hernandez*, 457 F.3d 416, 420 (5th Cir.2006)).[39]

> In *Barker,* the Supreme Court observed:
>
> The nature of the speedy trial right does make it impossible to pinpoint a precise time in the process when the right must be asserted or waived, but that fact does not argue for placing the burden of protecting the right solely on defendants. A defendant has no duty to bring himself to trial; the State has that duty as well as the duty of insuring that the trial is consistent with due process. Moreover, for the reasons earlier expressed, society has a particular interest in bringing swift prosecutions, and society's representatives are the ones who should protect that interest.

*Barker*, 407 U.S. at 527.

The Supreme Court has stated that none of the four Barker factors is either necessary or sufficient to find a speedy trial violation; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Frye II*, 489 F.3d at 213 (citing *Barker*, 407 U.S. at 533).

In *Frye II*, the Fifth Circuit discussed an alternative shifting of the burden of proof under the *Barker* analysis:

> The basic framework for applying the *Barker* factors requires that we first consider the length of delay. *Only if* the delay-length is sufficient to warrant judicial examination of the claim does a court weigh all four *Barker* factors. If the delay-length is sufficient, then a court determines whether "the first three *Barker*

---

[39] Notably, the *Frye* Court observed two possible standards of review with respect to the four-factor *Barker* test, noting, "the district court's factual findings in applying the elements of this balancing test are reviewed for *clear error*," and, therefore, "we defer to the findings of the district court unless we are left with a definite and firm conviction that a mistake has been committed." However, "[t]he standard of review for assessing a court's 'four-factors balancing' is unresolved in this Circuit." *Frye*, 489 F.3d at 209. The Fifth Circuit did not resolve the issue, opting instead to note that, even under a *de novo* review of the facts presented, the defendant's Sixth Amendment speedy trial rights were not violated. *Id.*

factors weigh so heavily in favor of the defendant that prejudice is to be presumed." "If prejudice is presumed, the Government can overcome that by 'showing that the presumption is extenuated ... or rebutting the presumption with evidence.'" *But if the first three factors do not weigh so heavily as to justify a presumption of prejudice*, then the *defendant bears the burden* of *both* establishing *actual* prejudice *and* demonstrating that such prejudice is *sufficient to outweigh the other three factors*.

*Frye II,* 489 F.3d at 209-210 (internal citations omitted)(emphasis added).

Under the first *Barker* factor, a one-year delay between the onset of the prosecution and trial is enough to trigger a full *Barker* analysis. *United States v. Frye [Frye I]*, 372 F.3d 729, 736-737 (5th Cir. 2004); *United States v. Hernandez*, 457 F.3d 416, 420 (5th Cir. 2006). However, the length of delay will generally not create a presumption of prejudice unless the post-indictment delay lasted *at least five years*. *Frye II*, 489 F. 3d at 210. Additionally, a lengthy pre-trial incarceration does not inherently offend a defendant's liberty interests. *Frye II* 489 F.3d at 213 (citing *Gray v. King* 724 F.2d 1199, 1204 (5th Cir. 1984)).

Under the second *Barker* factor, different weights are assigned to different reasons. *Frye II*, 489 F. 3d at 209-210. While a delay to permit the Government further to investigate the case is likely to harm a defendant (and, in that sense, likely to hamper the defense), reasonable investigative delay is not the kind of delay with which the *Barker* Court was concerned. *United States v. Frye [Frye I]*, 372 F.3d 729 (5th Cir. 2004) (citing *Doggett v. United States*, 505 U.S. 647, 656). The *Barker* Court was concerned with the Government's delaying in order to obtain an "impermissible advantage at trial." *Id.* Discovery abuses during the delay do not necessarily amount to prejudice relevant to a Sixth Amendment speedy trial analysis. *Frye I*, 372 F.3d at 741. "In other words, if a criminal defendant did not obtain or discover certain evidence in time for trial on one date, it is generally most unlikely that the Government would delay trial in order to attempt to prevent him from obtaining it in time for trial at a later date." *Id.*

In addressing the reason for the delay, the Supreme Court has held that if the government diligently pursues a defendant from indictment to arrest, prejudice will never be presumed. *United States v. Serna-Villarreal*, 352 F.3d 225, 232 (5th Cir. 2003) (citing *Doggett v. United States*, 505 U.S. 647, 656 (1992) ("if the Government had pursued [the defendant] with reasonable diligence from his indictment to his arrest, his speedy trial claim would fail ... so long as Doggett could not show specific prejudice to his defense")). In contrast, if the government acts in bad faith, i.e., intentionally holds back in its prosecution of the defendant to gain some impermissible advantage at trial, the delay will weigh heavily in favor of the defendant. *Id.* If a case involves neither diligent prosecution nor bad faith delay but instead **official negligence, the case occupies a "middle ground" where the weight assigned to the factor increases as the length of the delay increases**. *Id.* A court's **"toleration of such negligence varies inversely with its protractedness."** *Id.* (emphasis added).

Under the third *Barker* factor, namely, the defendant's diligence in asserting his Sixth Amendment right, the Fifth Circuit has expressed, "An assertion that charges be dismissed for a speedy trial violation is not a value protected under *Barker*." *Frye I*, 372 F.3d at 739. While dismissal remains "the only possible remedy" for a Sixth Amendment speedy trial violation, the Fifth Circuit observed:

> *By focusing on the remedy, Frye loses sight of the right.* The right, in this case, is the right to a speedy trial. **An assertion of that right is a demand for a speedy trial**, which will generally be **an objection to a continuance** or a **motion asking to go to trial**. At the very least, a defendant's assertion of his speedy trial rights should manifest "his desire to be tried promptly." *United States v. Litton Sys., Inc.*, 722 F.2d 264, 271 (5th Cir.1984). *Frye's repeated motions for dismissal of the capital charge are not an assertion of the right, but are an assertion of the remedy. A motion for dismissal is not evidence that the defendant wants to be tried promptly.* See, e.g., *Barker*, 407 U.S. at 534-35, 92 S.Ct. 2182 ("More important than the absence of serious prejudice, is the fact that Barker did not want a speedy trial ....

Instead the record strongly suggests that while he hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges, he definitely did not want to be tried.").

*Frye II,* 489 F.3d at 211-212 (emphasis added).

The fourth *Barker* factor, namely the prejudice to the defendant resulting from the delay, is to be evaluated in light of three interests: (1) to prevent oppressive pretrial incarceration; (2) to minimize the defendant's anxiety; and (3) to limit the possibility of the defendant's defense being impaired. *Frye I,* 372 F.3d at 729.

### 4. Rule 48(B) of the Federal Rules of Criminal Procedure

Rule 48(b) of the Federal Rules of Criminal Procedure provides:

(b) **By the Court:** The court may dismiss an indictment, information, or complaint if unnecessary delay occurs in:

> (1) presenting a charge to a grand jury;
> (2) filing an information against a defendant; or
> (3) bringing a defendant to trial.

FED.R. CRIM.P. 48(b)(West 2007).

FED.R.CRIM.P. 48(b) permits a district court to dismiss an indictment if there is "unnecessary delay in bringing a defendant to trial." Dismissal under Rule 48(b) is not *required* unless the constitutional speedy trial right has been flouted. *United States v. Garcia,* 995 F.2d 556, 561 n. 8 (5th Cir. 1993) (citing *United States v. Hill,* 622 F.2d 900, 908 (5th Cir.1980)). A district court has "extremely broad" discretion regarding whether to dismiss under Rule 48(b). *Id.* (citing *United States v. Novelli,* 544 F.2d 800, 803 (5th Cir.1977)). In *United States v. Anderton,* the Fifth Circuit stated:

> In the absence of direction in the Speedy Trial Act itself, a defendant's right to dismissal might be found in the Sixth Amendment or in Fed.R.Crim.P. 48(b) (discretionary dismissal for unnecessary delay). In either event, however, it is clear

that dismissal is warranted only upon a showing of sufficient prejudice caused by the violation of § 3161(j)(1) or, perhaps, a showing of improper prosecutorial motive.

*United States v. Anderton*, 752 F.2d 1005, 1008 (5th Cir. 1985).[40]

## C. Additional Evidence Submitted

It is noted the government has asked to submit additional evidence to this Court which was not submitted to the Magistrate Judge, namely exhibits and an affidavit, which are refused for the reasons noted below. None of the objecting parties has asked for a hearing. Accordingly, after a careful review of the record and all submissions by the parties, this Court sees no need to receive further evidence or recommit the matter to the magistrate judge with instructions; this Court however will adopt and incorporate certain of its prior determinations, made in open court and on the record as directly cited to herein, and discussed more thoroughly below. On the narrow issue of application of FED.R.CRIM.P. 48(b), this Court has allowed all parties the opportunity to submit additional briefing and thus, argument and evidence, as this issue was not fully presented to the Magistrate Judge.

## DISCUSSION

There are multiple objections offered by the parties to the Report and Recommendation submitted by the Magistrate Judge. For clarity, this Court will address the government's request to submit an affidavit and additional evidence first and then will move on to the specific parties' objections to the Report and Recommendation. The substance of the objections will be addressed in the following order: (A) the government's objections; (B) the defendants' objections; and (C)

---

[40] The Fifth Circuit has stated, "Delays of almost five years have been found not to violate Rule 48(b) in conspiracy cases." *United States v. Harrison*, 918 F.2d 469, 473-474 (5th Cir. 1990). However, *Harrison* and the matters cited therein describe the period of time *prior to indictment*, noting, 'there is no right to a speedy indictment." *Id.*

Travis Gallien's second Motion for Dismissal [Doc. 95] filed after issuance of Magistrate Judge Hill's Report and Recommendation.

## AFFIDAVIT AND EXHIBITS

For the reasons which are discussed more fully at greater length below, this Court is not persuaded as to the necessity, or propriety of the now presented, self-serving affidavit of the AUSA. A review of the untimely submitted affidavit reveals a regurgitation of the same arguments unsuccessfully made by the AUSA numerous times before this Court in the regrettable progression of the government's misadventures. This Court finds the government's dilatory attempt to interject, for the first time upon objection to the Report and Recommendation, a self-serving affidavit, which not only attempts to re-characterize already admitted to transgressions, but also mischaracterizes and takes out of context rulings and findings of this Court, is illustrative of the unfortunate pattern of dilatory and regrettable conduct that has plagued the AUSA's conduct in this case from its outset.

Further, as noted elsewhere herein, the AUSA's affidavit **was not submitted to the Magistrate Judge for consideration** and thus **defendants have had no opportunity to respond** and thus, the argument should not be submitted now, for the first time to this Court. Further, the affidavit purports to characterize and explain this Court's rulings and record; this Court has full benefit of the complete and accurate record and has reviewed the complete record and will in no way benefit from the AUSA's attempt to re-write the official record. Further, due to the AUSA's dilatory conduct, defendants once again, are given little or no opportunity to respond to, review, or address the AUSA' self-serving and often inaccurate "evidence." Again, the AUSA's untimely and inappropriate conduct would create an inappropriate strategic advantage. The AUSA failed in his obligation to present the necessary argument and evidence to the Magistrate Judge and now attempts

-45-

to correct that failure at the expense of the defendants and the rules of court; to present argument, in the guise of "evidence;" and to do so untimely, leaving defendants no opportunity for meaningful rebuttal. The AUSA did not submit the self-serving affidavit until *after* argument and submissions of all parties had been made to the Magistrate Judge and *after* Magistrate Judge Hill had presented his thorough and well-considered opinion. This Court finds the affidavit is an attempt to present rebuttal *argument* not presented to the Magistrate Judge, and rebuttal argument offered only ***after the Magistrate Judge had noted the record was bereft of any rebuttal by the government on that issue***. *See, e.g., Report and Recommendation*, [Doc. 83] pp. 26-27 (noting the absence of government rebuttal to actual or presumed prejudice). Further, to the extent, if any, there might be "evidence" in the affidavit, that information is not newly discovered. Consequently, as the affidavit was not presented to the Magistrate Judge, contains no newly discovered evidence, it is of no benefit to this Court in light of the extensive record detailing this regrettable odyssey, and as the affidavit is argument thinly disguised as "evidence," the Court finds the affidavit is inappropriate. No persuasive explanation for the government's failure to have presented the affidavit before this time has been offered. This Court finds the affidavit is not properly before this Court and is of no value to the Court. Thus, this court, for the noted reasons, declines to, at this late date, accept the affidavit as acceptable "evidence."[41]

This Court will, however, address the government's other exhibits presented merely for ease

---

[41] In order to make its ruling on the affidavit, the Court however, was forced to review the complete substance of the affidavit and this Court, as noted, found the self-serving affidavit testimony of the AUSA wholly failed to provide any meaningful support for a conclusion Magistrate Judge Hill erred, however, the AUSA's myriad of deliberate mischaracterizations cannot go unaddressed. Therefore this Court notes and adopts those relevant portions of the record made herein and on the record throughout this matter, as well as the reasons given at each juncture, in their entirety, noting with particular emphasis this Court's summary given on June 27, 2006 at pages 82 through 218, where this Court gave a full history of the AUSA's unfortunate conduct.

of discussion and reference. Thus, this Court accepts the remaining proposed exhibits submitted by the AUSA for the purposes of reference and discussion only.

## THE THREE MISTRIALS

Regrettably, this Court first must address the government's specific, less than accurate, factual assertions and mis-characterizations found within its briefing and arguments made therein. Again as, regrettably, the government's factual inaccuracies and mis-characterizations are voluminous, they can not exhaustively be reviewed in this forum, rather, this Court will address the more relevant inaccuracies by addressing the relevant history, as argued by the government, of each of the three mistrials: (1) the May 2003 Mistrial; (2) the October 2004 Mistrial; (3) the June 2006 Mistrial and Dismissal of the Indictment.

### The First Mistrial - May 2003

This Court granted defendants' motions for a mistrial following a number of errors, including the government's initial failure to comply with Magistrate Hill's May 21, 2002 Order requiring the government to disclose the unindicted co-conspirators it intended to call at trial. Citing no authority, the government continues to argue it need not have complied, at all, to Magistrate Judge Hill's order, because its witness list is "fluid and subject to additions and deletions as trial preparations and the trial itself progresses," and argues that as Magistrate Judge Hill's *May 2002* Order requiring the government to disclose the names of unindicted co-conspirators "did not specify the manner in which the United States was required to comply," the government's failure is excusable. [*Objections*, Doc. 88, pp. 5-6]. This argument is specious on both counts. Magistrate Judge Hill's Order reads as follows:

> Before the court is the motion of the defendant, George Celestine, for a Bill of Particulars pursuant to Rule 7(f), FRCrP. [doc.138]. By this request, the defendant

seeks the names of any unindicted coconspirators that the government will call as trial witnesses. The government responds by agreeing to provide the names of any unindicted coconspirators who will testify, when a witness list is formulated. [doc. 143]. The government's position is that the defendant's request is at this time premature, since trial is not scheduled to commence until September 9, 2002.

**The purpose of a Bill of Particulars is to assist the defendant in the preparation of his defense and to prevent unfair surprise at trial.** *United States v. Linn*, 889 F.2d 669 (5th Cir. 1989). **Both the government and the defendant agree that a request for Bill of Particulars is the proper vehicle by which the defendant can seek to be apprized of the names of the unindicted coconspirators who may testify against him**. On proper motion, the Bill should be granted, and the names of the unindicted coconspirators should be disclosed to the defendant. *United States v. Hughes*, 817 F.2d 268 (5th Cir. 1987) and *United States v. Barrentine*, 591 F.2d 1069 (5th Cir. 1979).

Accordingly, IT IS ORDERED, that the defendant's Motion for Bill of Particulars is hereby GRANTED, and **the government is ordered to disclose the names of unindicted coconspirators who it will call as witnesses at trial**. *The disclosure of the names of the unindicted coconspirators who may testify are to be disclosed **as soon as practicable**, and the government is **to supplement its response as necessary as required by Rule 7(f) FRCrP**. (emphasis added)

The order of the magistrate judge clearly contemplated the "fluidity" of pre-trial investigation, as does the cited Federal Rule of Criminal Procedure, and thus, ordered the government "to supplement its response as necessary as required by Rule 7(f) FRCrP."[42] [Doc. 157]   It is beyond question that by filing an indictment, the government must have knowledge of the charges made.  Here, the charge encompassed a conspiracy alleged to have spanned more than ten years, and to have extended ". . . from points in the State of Texas to locations in the Western District of Louisiana and elsewhere within the United States." [Doc. 1]  At the stage of the grand jury, the government knew its core case and those they believed constituted the conspiracy as is evidenced by their receiving the return upon the indictment.  Thus, they were in a posture to comply with Magistrate Judge Hill's Order **at that**

---

[42] *See* note 5 *supra*.

**time** and **thereafter**, as ordered and contemplated by FED.R.CRIM.P. 7(f), **to supplement** the list as necessary. To now argue "fluidity" as an excuse for complete failure to comply with Magistrate Judge Hill's Order is specious. Regrettably, the government's present position is particularly specious as the AUSA himself admitted in 2003 when asked why he had failed to comply, "The government – **or I simply forgot about Judge Hill's order**." [Trial Tr. vol. III, 552, May 7, 2003](emphasis added).

The government's argument is especially problematic as the "fluidity" of the identity of unindicted co-conspirator witnesses the government intended to use to prove the existence of the hotly disputed conspiracy, had and has been a consistently contentious matter among all parties.[43] The defendants have consistently and steadfastly maintained the government cannot prove *the existence of the particular conspiracy as pled* nor *their participation in that particular conspiracy* because *there never was such a conspiracy* as alleged in the indictment *in which these defendants participated*. Thus, the identity of the unindicted co-conspirators by whom the government intends to establish the existence *of this particular conspiracy* has been paramount to the defendants' ability to defend against the government's charge *the conspiracy as charged existed, and the defendants were a part of that conspiracy*. This nuance of substance underlay the granting of the initial Bill of Particulars; a nuance the AUSA failed, it would seem, to recognize, whether by inability or intent. Clearly the government does not agree with the defendants' basis for their defense, however that does not grant the government the right to withhold the notice necessary for defendants to prepare

---

[43] The indictment specifically identifies "unindicted co-conspirators" with respect to "overt acts" and actions "in furtherance of the conspiracy." This Court will assume that, at least as of the date of the filing of the indictment, the government had investigated this matter sufficiently to form a reasonable belief as to those core members of the charged conspiracy and the accuracy of the statements contained in the indictment. Defendants from the outset have sought the identity of those unindicted co-conspirators.

an adequate defense.

All parties agreed a Bill of Particulars was the proper procedural vehicle for defendants to obtain the names of the unindicted co-conspirators who may testify against a given defendant. Once the Magistrate Judge ordered the government to *be particular* and to name those unindicted co-conspirators they intended to call at trial and to supplement that list, the government could no longer argue "fluidity" as justification for failing to disclose those names *with particularity* and for failure to supplement any discovery made. The government had, with the Order of the Magistrate Judge, been ordered *to be particular* in its disclosure and thus, could no longer rely on obtuse, generic references.

The government charged in their indictment a conspiracy broad in place and time. Celestine's counsel filed a motion in *March 2002* seeking a *Court Order* requiring the government to *identify the unindicted co-conspirators anticipated to be witnesses* at trial; the government *resisted* providing the information, arguing the matter was "premature," notwithstanding an investigation[44] having led to the arrest and indictment of ten defendants for a conspiracy alleged to have been ongoing since January 1, 1991[45] and to have spanned the entire United States, and have ended some six and one-half years earlier. Magistrate Judge Hill rightfully, did not accept the government's "prematurity" argument and *Ordered* the government to provide the names of the unindicted co-conspirators who would testify at trial *and to supplement that disclosure as necessary*. Thus, Magistrate Hill's Order, contemplated the need for "fluidity," was *never appealed* or otherwise challenged by the government, and was in place as of **May of 2002**.

---

[44] See, *e.g.*, Government's Opposition to the Defendants' Motions to Dismiss [Doc. 79, p. 2 n.1].

[45] *See* Indictment filed November 16, 2001 [Doc. 1].

Magistrate Judge Hill specifically expressed, "the purpose of a Bill of Particulars is to assist the defendant **in the preparation of his defense** and to **prevent unfair surprise** at trial." (emphasis added) Despite Magistrate Judge Hill's Ruling and Order, the government admits it "*forgot*" about the May 2002 Order. Yet the government now, also, argues contradictorily, that it need not have complied, as the list is "fluid," that the Magistrate Judge did not specify the manner of compliance and it complied with the Order, in the manner it saw fit, and therefore, there can be no foul.

Specifically, after admitting it "forgot" about the order, the government, nonetheless, contends it, also, "complied" with Magistrate Judge Hill's May 2002 Order as it provided "adequate information" when it met with defense counsel to discuss *the 86 witnesses* found on the government's *witness list* given to defendants on April 29, 2003. That list contained some 86 witnesses listed in alphabetical order, and did not delineate which of the witnesses might be unindicted co-conspirators the government intended to call at trial.[46] [*Objections*, Doc. 88, pp. 6-7]. Magistrate Judge Hill did not order the government to, at its leisure *some eleven months beyond the date of his Order*, pick and choose how, with what, and when, it might desire to comply with his order and ultimately chose to present some 86 names listed alphabetically, with no designation as to their relationship to the multiple offenses and multiple defendants, and no way identified as unindicted co-conspirators, and at some point thereafter, have a discussion with defense counsel disputed in context and nature. Magistrate Judge Hill Ordered the government to identify *the unindicted co-conspirators they were going to call at trial and to supplement that disclosure*; providing 86 names listed alphabetically, is not complying with the Magistrate Judge's order, nor

---

[46] Not until after the mistrial of May 7, 2003 did the government, on May 12, 2003 in response to a subsequent order of this Court, provide a list of unindicted co-conspirators the government intended to call at trial.

is it, as the government argued, doing more than required. Rather, it is more akin to an attempt to not do what is required. The government's action is more akin to hiding the needle in the proverbial haystack in order that it not be found. At no time prior to any of the three trials did the government comply with Magistrate Judge Hill's Order *in any meaningful manner* and *timely grant* the defendants the information necessary for defendants to adequately prepare their respective defenses – particularly given the nature of the defenses intended.

The government ignores its failure to comply with Magistrate Judge Hill's Order and, rather, argues it "far exceeded" its *discovery* obligations by providing "early disclosure of 302s" and a "complete witness list" and by "meeting with defense counsel to discuss the various witnesses." Again, the government misstates the issue and is disingenuous. Discovery is not the issue at hand. Arguing the defendants could have ferreted out information ordered disclosed by the Court from a mass of disjointed information the government had provided over a period of four years begs the question entirely. The government unsuccessfully offered this argument in 2003, and this Court finds the government's argument no less disingenuous at this juncture. Additionally, the government – even within the 86 names provided on the April 2003 "Government's Witness List - Alphabetical Order," – failed to include three witnesses included on the list of 23 unindicted co-conspirator presented on the morning of the third trial in June of 2006, and also, failed to adequately identify an unindicted co-conspirator called as a witness. The defendants objected. When asked to explain its conduct in May of 2003, the government noted:

> The Court: That's disingenuous Mr. Clemons. When I was asking about how you complied with Judge Hill's Order, you told me you complied by providing the 302 of Kevin Jackquet. The 302 of Mr. Jackquet said "Wayne" as opposed to "Jonathon Wayne."

> Mr. Clemons: Well, Your Honor, I had no way of knowing the 302 only said "Wayne" as opposed to "Jonathon Wayne."

| The Court: | Yes, you did. It's your 302. |
|---|---|
| Mr. Clemons: | **Yes, Your Honor,** *but I didn't read it to see what name was on that one as opposed to – compare it with the name that was on the witness list because I knew who the person was when I saw the person's name.* |
| The Court: | Exactly. |
| Mr. Clemons: | I didn't mislead the Court implying that I thought Jonathon Jefferson was in the 302 and that Jonathon Jefferson was on the witness list. I have no intent to do that. I have no need to do that. |
| The Court: | That is exactly my point, Mr. Clemons. You knew who the man was, and you were ordered by Magistrate Judge Hill in May of last year to identify that man among others. *And you told me the manner in which you did it was by way of the 302.* That identifies *Wayne Jefferson.* |
| Mr. Clemons: | *Right.* |
| The Court: | All right. And then you tell me that the *Jonathon Jefferson* that's on your witness list, you knew it was the same man, *but didn't tell Mr. Boustany that because he didn't ask.* But I'm telling you, *the Court ordered you to give this information up.* So we're back to the point of notice as your co-counsel so succinctly pointed out. Whether or not the defense had enough notice so that they would not argue that they were surprised if we are dealing with prejudice. And what Mr. Boustany is saying is I had no way, he meaning I, had no way to tie together the 302 that talks about a Wayne Jefferson and the Jonathon Jefferson that was identified to me as an unindicted co-conspirator that you were intending to call. You didn't tie the dots together. At this point he is arguing prejudice and he's making a valid argument. |

[Trial Tr. vol. II, 473-474, May 6, 2003] (emphasis added).

The government's argument attempted to shift the focus from its failure to have complied

with a court order, and their failure to give defendants fair notice, to an argument the defendants did

not try hard enough to, in effect, read the government's mind, as the government argues it knew who

Jefferson was and the defendants therefore, could have and should have been able to divine what the

AUSA knew but did not choose to disclose. To argue it need not comply with the Bill of Particulars, that it need not comply with Orders of the Court ordering it to comply with the Bill of Particulars, that it need not grant the defendants sufficient notice – both in time and content – to adequately prepare their defense, is so disingenuous as to border on being mala fide.

The issue of the existence of the conspiracy and these particular defendants' participation in the conspiracy as charged has been in great dispute since the indictment; each defendant has, repeatedly, made their theory of defense known and repeatedly requested the identity of the unindicted co-conspirators the government intended to use to prove the existence of the conspiracy charged and their participation therein. Thus, the government has at all times been aware of the importance to defendants of this information. Yet, the government repeatedly refused to provide the information. The identification of those unindicted co-conspirator witnesses was and remains of paramount importance to each defendant's ability to prepare an adequate defense; the government was aware of that argued importance. The Court recognized the importance and ordered the government to identify those witnesses **"as soon as practicable"** and to **"supplement"** that list – **the government did neither.** To argue they did not know who they intended to call at trial and in the same breath argue they had nonetheless complied by way of other discovery, is as contradictory as it is disingenuous and defies all logic particularly *as they prepared for and began trial.* The government's argument is one wholly without merit or worth.

The government's present argument is particularly egregious as this Court took great pains to explain the nuances of this particular issue on multiple occasions to the AUSA, noting the identification of unindicted co-conspirators intended to prove up the existence of the conspiracy at trial was the issue presented to Magistrate Judge Hill, who had issued **a May 2002 Order of the Court,** ordering the government to identify **"the unindicted co-conspirators"** the government

expected to call at trial "**as soon as practicable**" and to "**supplement**" that disclosure. And

explaining that at that point, the "onus shifted" to the government to identify those unindicted co-

conspirators:

> The Court: Hold that thought, Mr. Clemons. The argument that you are making so eloquently is the fact that after you have knocked someone completely to the ground that they are not getting back up. It's the only way hopefully I can get you to see this point. This is the point that I'm not going to belabor with you, anymore, all right? The onus shifted on Jefferson with Hill's Order.

> Mr. Clemons: Shifted to what, Your Honor?

> The Court: Shifted that you were the one who had the obligation to make it known to Mr. Boustany as to who you were going to call as an unindicted co-conspirator. It shifted to you, the one you were going to call at trial, and Mr. Boustany is saying, "I don't know nor did I ever know," and you are saying, "well, you could have figured it out, and because you didn't figure it out you didn't object," and I'm saying, "No." And I'm not going to belabor that point with you anymore. We've [sic] belabored it yesterday and we've belabored it today. Clearly we're going to see this issue differently. I had hoped that perhaps I could at least get you to see it so that in the future we wouldn't have this problem, but unfortunately it is the way I view that issue, and that issue is, "Once Judge Hill told you to do it, you had the obligation to see that it was done."

[Trial Tr. vol. III, 565, May 7, 2003][47]

This Court on May 7, 2003, also expressed concern over the sufficiency of the discovery

which the government had produced by April 2003:

> The Court: Now, within the spirit of Judge Hill's Order, you should have given them the full identity of the person.

---

[47] It is noted that, on May 7, 2003, this Court discussed at length several Fifth Circuit matters, including *United States v. Leach*, 918 F.2d 464, 467-468 (5th Cir .1990), wherein the Fifth Circuit addressed the "advocacy roles of the prosecutor and defense counsel."September 14, 2007.

Now, the government yesterday argued that, yes the rap sheet was sent three and a half weeks before. I agree. Ordinarily that's fine. It's for the defense to ferret out, but for the fact you had an obligation to comply with the spirit of Judge Hill's Order, and the two were not linked by the government. Next.

Mr. Clemons: Anyway, the point is the issue of prejudice, **Your Honor. Judge Hill's order said list the names of the co-conspirators**. I did that. In the spirit —

The Court: No you did not. You never gave them a listing of the unindicted co-conspirators that you intended to call at trial and that's what he ordered you to do. There is a difference Mr. Clemons between giving them a list of all the witnesses you intend to call at trial and giving them a list of the unindicted co-conspirators you intend to call at trial. You never did that.

Now, verbally, you sat down and you went through it and you did identify for them who they were and not only who you intended to call, but which ones as to which parties, and I agree that is a good thing, but that's when we get into the problem of their not realizing that Jonathon Jefferson is Jonathon Wayne Jefferson, particularly when we had a Willie Jefferson that is not the same as Wayne Jefferson, and that's when we get into the notice problem, and you are correct, where we come down to it, and the only reason I am belaboring these nuances with you, Mr. Clemons, is I really want you to understand them.

Mr. Clemons: Oh, I understand them.

The Court: For the future.

Mr. Clemons: I understand.

[Trial Tr. vol. III, 554-555, May 7, 2003]

Regrettably, however, *all four defense attorneys* dispute the government's assertion the AUSA verbally identified the witnesses, as he argued. In responsive argument *all counsel for all defendants denied Mr. Clemons informally identified the unindicted co-conspirators and those he*

*intended to call at trial.*[48] All admit counsel met; however, collectively, all defense counsel dispute the AUSA's characterization of that meeting. All agree Mr. Clemons met with them, but none agree Mr. Clemons identified those unindicted co-conspirators as Ordered by the Court. Furthermore, and regrettably, the AUSA had had an unfortunate, but clear pattern, in this case, of obfuscating and being less than forthright with the Court and defense Counsel. Not only do defense counsel, collectively, disagree with the government's characterization of the meeting had, but *at least two* of the defense attorneys, also, attest they *never received the argued 302* describing a "Jefferson" at issue in May 2003,[49] and such differences of opinion permeate the history of this matter. Notwithstanding the controversy surrounding the multiple "Jeffersons" and multiple names for "Jonathon Jefferson," there is clearly *no* reference to "Kenneth 'Rock' Gage" in the government's "witness" list which was provided to defendants on April 29, 2003, **only five days before the May 5, 2003 trial** and yet, testimony presented by the government at the May 5, 2003 trial encompassed "Gage" as a pivotal unindicted co-conspirator. Although it still remains unclear as to whether the government intended to call Gage as a witness, his statement as an unindicted co-conspirator was placed at issue with Jefferson's testimony. Moreover, of pivotal importance for this Court in assessing the credibility of the AUSA and the defense counsel on this point, was the *unanimous, obvious, and overt surprise and frustration* exhibited and expressed by *all* defense counsel, *spontaneously*, in open court when the government elicited the Jefferson testimony. The collective, spontaneous, response exhibited by all defendants' counsel was genuine, credible, and wholly

---

[48] As all four defense counsel dispute the AUSA's assertion he identified the unindicted co-conspirators he intended to call at trial, at that meeting, the need for the government to have properly complied with an order of the Court, is highlighted.

[49] See note 16.

undermines any assertion by the AUSA that notice had been received by defense counsel and that the government had complied with Magistrate Judge Hill's Order *in any meaningful fashion*. Moreover, the absence of any writing or filing complying with the Order before the May 5, 2003 trial establishes the government did not comply *with the Order*; the shock spontaneously expressed by all four defense counsel argues *notice* was not given.

The government, lastly, argues this Court granted the May 2003 mistrial only "out of an abundance of caution." [*Objections*, Doc. 88, p. 9] The government again deliberately mis-characterizes this Court; at no time did the Court grant the mistrial "out of an abundance of caution." *See:* Trial Tr. vol. III, May 7, 2003.

This Court ADOPTS its full reasons given for its prior rulings outlined at Trial Tr. Vol II, 89-218, June 27, 2006 on this issue and HEREBY INCORPORATES both the outline and the rulings referenced therein, including its reasons for granting the mistrial May 7, 2003 [Trial Tr. Vol III, 528-574, May 7, 2003] in their entirety, as **part of this Court's findings of fact**.

This Court finds the government's factual assertions made in its Objections to the April 2006 Report and Recommendation as to the events leading up to and encompassing the first mistrial are factually inaccurate and disingenuous. This Court further finds the government did not comply with Magistrate Judge Hill's Order before the May 5, 2003 trial, and did not grant defendants' sufficient notice to have allowed defendants the opportunity to adequately prepare their respective defenses.

### The Second Mistrial - October 2004

This Court granted the defendants' motions for a **mistrial** in the second trial on **October of 2004** as a result of **the government's sole, and repeated failure** to have complied with Magistrate Judge Hill's and this Court's Orders, failure to grant defendants adequate notice, and failure to

produce ordered discovery information timely. The government inexplicably argues its conduct should be overlooked as the defendants did not like the racial make-up of the jury and thus, the government's negligent actions, which were the sole reason for the declared mistrial, should be overlooked. [*Objections*, Doc. 88, pp. 10-11]. The government's argument is not in any part persuasive. The mistrial was declared due to the *government's misconduct alone* – and was in no way the result of the defendants' conduct. Whether the defendants liked the jury makeup or not is wholly irrelevant *when the government's conduct and the government's conduct alone*, precipitated the second mistrial. The government's argument is better seen as an attempt to deflect the focus from its conduct which had precipitated a mistrial, namely the government's failure once again, to have provided defendants with that which was ordered and due – here, transcripts required produced by an Order of the Court and pursuant to the Scheduling Order. Defendants did nothing to prompt the mistrial; rather, the mistrial was prompted solely by the governments' actions.

The government also, repeatedly, argues the Court in **May of 2003**, found no *bad faith* on the part of the government as to its failures, and the government, in part, is correct. [*Objections*, Doc. 88, pp. 14-16] However, the government argues the statements made by this Court in a vacuum and fails to note the subsequent mistrials, and neglects to mention the subsequent declarations by this Court made as the pattern of conduct became clear and the Court was faced with such a plethora of repeated failures, omissions, neglect or misconduct that the Court in 2006 noted, **"either the work is so shoddy or the intent is so impure that we get to a really difficult place."** [Trial Tr. vol. I, 64-65, June 26, 2006]

Overall the government's argument as to the Court's comments as to the government's failure to provide defendants with the transcript of an interview of Charles by a government agent,

Perez, which the government attempted to use to rehabilitate Charles – the government's witness – is disingenuous and misplaced. This Court's having noted, as the government argues, that the government would not have brought the substance of the Perez statement – which had not been provided by the government to defendants – to defendants' attention had the government intended to conceal it, does not support an argument of *good faith*, rather, it argues for the existence of an alarming level of negligence on the part of the government. [*Objections*, Doc. 88, p. 16].

The government, also, suggests this Court granted the second mistrial because the Court, "out of an abundance of caution," may have been "influenced by her concerns related to the defendants' previous requests for a mistrial based on alleged judicial errors which the Court denied." [*Objections*, Doc. 88, pp. 16-17]. The government does not identify what specific "requests for a mistrial" or "alleged judicial errors" it references or where, within the record such allusions might be found, and this Court's full and exhaustive review of the record does not support or identify to what the government obtusely, without cite, alludes. This statement is ill founded and wholly erroneous. Full reasons for the Court's actions were given on the record and in no way support the government's interpretation. [Trial Tr. vol. V, 1125-1163, October 8, 2004] A full review of the reasons given on the record presents no justification for the government's present mis-characterization.

This Court reiterates, the October 2004 mistrial was the direct and sole result of *the government's negligence*. The government had *again* failed to timely produce material ordered by the Court; here a copy of "the Perez interview," the transcript of which the government attempted to use to rehabilitate its witness and which contained possible exculpatory information as to at least one of the four defendants. This Court's October 2004 reasons for ruling are HEREBY ADOPTED

AND INCORPORATED in their entirety into this ruling. [Trial Tr. vol. V, 1125-1163. October 8, 2004]

## The Third Mistrial - June 2006

This Court granted defendants' motions for a third mistrial, that of the June 26, 2006 trial, following the government's submission of its "List of Unindicted Co-conspirators it Intends to Call as Witnesses," **on the morning of trial**, which contained **five unindicted co-conspirator witnesses for trial testimony who had not been on the April 29, 2003 "Government's Witness List - Alphabetical Order," nor the May 12, 2003 "Government's List of Unindicted Co-conspirators it Intends to Call as Witnesses."**[50] The list given to defense counsel **after jury selection had begun,** also contained **one name which had been disclosed as a "witness" on the April 29, 2003 "Government's Witness List - Alphabetical Order," but who was not identified as an unindicted co-conspirator on the May 12, 2003 "Government's List of Unindicted Co-Conspirators it Intends to Call as Witnesses."** The government admitted the omissions, but now argues its actions should be excused as it need not have supplied the list of unindicted co-conspirators at all, as ordered by Magistrate Judge Hill in 2002 [Doc. 157] and by this Court multiple times thereafter, because they had chosen another means of compliance, i.e., to informally meet with

---

[50] These five witnesses are denoted with an asterisk on Court Exhibit A. The difficulty experienced by the Court in determining the government's witnesses and intent as to those witnesses supports the finding the government's actions resulted in prejudice to defendants and trial advantage to the government.

Depending upon which of the government's lists and the witnesses contained therein one is comparing, to which other of the government's lists and witnesses, the inconsistencies and discrepancies vary; thus exacerbating the problem of comparison experienced by defendants and this Court.

In order to determine which witnesses were included on which of the government's lists, the Court was forced to create a flow chart of the government's disclosures. The task presented was daunting in and of itself, and thus, itself undercuts the government's argument the defendants could have and should have ferreted out the information the government had been ordered to provide in response to the Bill of Particulars. The chart is attached hereto as "Court Exhibit A."

defense counsel on May 10, 2006, less than one month before the *third* trial, and to provide a "general" witness list and to informally identify the unindicted co-conspirators found on that list.[51] [*Objections*, Doc. 88, pp. 17-19]. The government further argues **the morning of trial** disclosure was sufficiently timely as to provide adequate notice and if not, as they had thereafter agreed not to call the offending witnesses – which begs the question as to why they added the witnesses – there can be no prejudice.

**On the morning of the June 2006 trial the government provided a list of unindicted co-conspirators to defense counsel containing three witnesses heretofore never disclosed and for the first time identified others as unindicted co-conspirators whom the government would call at trial**. The three witnesses identified by the government as unindicted co-conspirators they intended to call at trial had been, in fact, named on *none* of the government's previous disclosures. Thus, the government now, for the first time, some four years after Judge Hill's order, purported to supplement its list – **on the morning of trial** – and added three unindicted co-conspirators *who had never before been identified* by the government as potential witnesses in any of their previous purported attempts to comply. The government argues however, that as it "offered" *on the morning of the third trial*, this list which contained the three new witnesses and the additional witnesses who were unindicted co-conspirators, it complied with the magistrate's order, and argues defendants had sufficient notice, even though this new disclosure was given to defendants as trial began; arguments specious on their face.

The government again, omits relevant facts. The government had been ordered *multiple times,* over *four years,* to disclose the names of the unindicted co-conspirators it intended to call at

---

[51] *All four defense counsel* dispute the government identified the unindicted co-conspirators they intended to call at trial, at this meeting.

trial and *to supplement that list*. The conspiracy had ended one and one-half years before the **first** trial and the government had *proceeded to trial three times*. Yet, the government had not provided any disclosure of the unindicted co-conspirators before the first trial, and as of the morning of the third trial added three heretofore **never identified unindicted co-conspirators**. Thus, disclosure and notice, if even only as to these three, had never been granted. Despite the government's intimate familiarity with its case, having prepared for trial *three times and* begun trial *twice* previously, the government had not included at least three witnesses *whom the government – on the morning of the third trial – identified as among those unindicted co-conspirators it intended to call at trial.*

Additionally, as discussed more fully on the record of June 26, 2006, the government's conduct revolved around statements made by co-defendant and known co-conspirator Charles, which clearly should have necessitated a *James* hearing *notwithstanding the government's May 7, 2003 assertion at the outset of the James hearing that a James hearing would not be necessary because the government assured the Court and defendants it would not seek to introduce "any co-conspirator statements."*[52] **The government, in order to avoid the strategic disadvantage of the display of their evidence required by the *James* hearing, at that hearing's outset, assured the Court and all defendants it would not seek to introduce "any co-conspirator statements" and yet once beyond the risk of the *James* hearing – with no notice to either the Court or defendants – the government led its case with a co-conspirator and his testimony as to the conspiracy.**

The government also, argues in defense of its position as to the third mistrial, that it is being

_____

[52] At no time thereafter did the government, in any fashion, inform the Court or defendants that its May 2003 assertion – made after the declaration of mistrial of the first trial and in preparation for the upcoming trial in order to avoid the imminent hearing – was no longer valid, yet led with objectionable testimony of a co-conspirator. [Tr., 10/7/04, pp. 881-939]

"punished" for its having provided *more* discovery than required under FED.R.CRIM.P. 16. [*Objections*, Doc. 88, p. 21]. Again, the government attempts to twist the facts and context involved. As explained *supra*, defendants filed a Motion for a Bill of Particulars; the Magistrate Judge granted that motion and ordered the government to *identify those unindicted co-conspirators it intended to call at trial in order to prove the conspiracy charged* so that defendants could adequately prepare for trial and to do so "*as soon as practicable*" and to "*supplement that disclosure.*" This Court refers the government to the reasons given on the record on May 7, 2003, when the government offered this same argument on the opening day of the third trial:

> The Court: Okay. Now that is exactly why I have belabored this point with you, Mr. Clemons, because, no, **you are in no way being punished** because you gave him a 302. First off, **no one is being punished**. Second off, the issue before the Court is different and distinct because of Judge Hill's Order. That is what – on this very narrow issue of Mr. Jefferson, you are not being punished because you gave them more than you had to. **The problem that the Court has is you did not give them what Judge Hill ordered you to do. That is the problem, Mr. Clemons. And when the identification was actually made, it was made in a fashion that did not give full identification of Jonathan Jefferson . . . .** [T]he fact of the matter is, and this is where I keep trying to get the government to come back to in their thinking, once Judge Hill ordered you to identify these people, you have the obligation to live up to the spirit of that order, and that order is to give them enough information such that they can look at what has been provided, no matter what it is, even if you had given them nothing, enough information so that they can do what they need to do and have proper notice.

[Trial Tr. vol. III, 557-558, May 7, 2003] (emphasis added).

On May 7, 2003, this Court again belabored the distinction between providing that which was ordered and that which was not. Nevertheless, the government continues to ignore the fact it failed to comply with multiple Court Orders and failed to give the defendants crucial information they sought – the identity of the unindicted co-conspirators the government intended to call at trial to

prove up the existence of the conspiracy charged and the respective defendants participation in that charged conspiracy, until *the morning of the third trial.*

This Court finds the government's argument on this point particularly perplexing as the government admits it would have appealed Magistrate Judge Hill's Order had Magistrate Judge Hill ordered the disclosure of "the universe of all possible unindicted co-conspirators." Thus, the government admits the distinction between "all possible unindicted co-conspirators" and "unindicted co-conspirators the government will call at trial," exists and is relevant. [*Objections*, Doc. 88, p. 22, n. 17] No less relevant is the distinction between "all witnesses" and those unindicted co-conspirators intended to be called. Thus, the government implicitly recognizes it had an obligation to delineate those witnesses who are unindicted co-conspirators whom they intend to call at trial, rather than the universe of all possible witnesses. Hiding the relevant "needle" in the haystack of all possible witnesses and continually "shifting the target" – as defendants have argued – is not reflective of "doing more than required" to the contrary, and now to argue otherwise, is particularly disingenuous.

The government argues its conduct should not be looked at "in a vacuum," but should be viewed "in relation to the discovery the defendants have." [*Objections*, Doc. 88, p. 23 n. 18]. This argument begs the question. The government conflates its repeated failure to comply with the multiple orders of the Court, to comply with the Bill of Particulars and the resultant failure to grant defendants sufficient notice – in both time and substance – of those unindicted co-conspirators they intended to use to prove up the existence of the disputed conspiracy charged and the defendants participation in that conspiracy, the government's failure to provide the transcript of the Perez interview, the government's failure to properly identify Jefferson, and argues that notwithstanding

their failure to provide the notice and disclosures ordered, the defendants, nonetheless, should have been able to ferret out whatever information they needed from the plethora of disjointed and often problematically produced discovery,[53] and thus, notwithstanding their conduct, no prejudice was had, or because **on the morning of the third trial** they finally provided some of the information ordered – defendants should be found to have had sufficient notice of that information and sufficient time to prepare a defense in a complex conspiracy trial and thus, their negligence and failure should be excused. For the government to argue an AUSA need not comply with the Court's Order granting a request for a Bill of Particulars until <u>after</u> trial has begun and that because *he* is of the belief the government *need not be particular*, it need not comply is specious on its face.[54]

The government, again as to this mistrial, argues there must have been "confusion" on the part of the Court created by the argument of the defendants; the Court suffered from no such confusion. [*Objections*, p. 21]. The only confusion experienced by the Court was and is how the government could have been so disingenuous, unreliable, and negligent, in the face of the multiple and repeated indulgences granted the government by the Court.

The government, also argues the defendants were not prejudiced by the government's repeated and admitted failures, as it "offered to make a number of concessions detrimental to its case in an effort to proceed to trial with the empaneled jury." [*Objections*, Doc. 88, p. 26]. It is not lost on the Court that the government "offered" such "concessions" in order to *minimize the prejudice the government's conduct had created*. Thus, for the government now, to argue its initial conduct

---

[53] *See*: Trial Tr. vol. I, 24-26, June 26, 2006.

[54] To the extent the AUSA argued his conduct should be excused as he does not know even at the time of his brief, how he will prove the "conspiracy" charged in the indictment, this Court has grave concern as to the level of the AUSA's trial preparation, or the propriety of its motives.

created no true prejudice, is contradictory and disingenuous.

Perhaps most distressing, is the government's argument it should not be held to its assertion made on May 7, 2003 at the outset of the *James* hearing. After the mistrial had been declared, the jury dismissed, and the trial rescheduled, the Court began the *James* hearing in preparation for and anticipation of the next trial. Upon commencement of the *James* hearing, the government asserted there was no need for the *James* hearing as they would introduce no co-conspirator's statements. It must be noted that at this point, the mistrial had been declared, the jury had been dismissed, and the trial had been rescheduled, consequently the government's assertion was as to *the trial then set for May 19, 2003*. Thus, the government made its assertion *as to the May 19, 2003 trial*, **and at no time informed defendants or the Court that assertion was no longer to be relied upon**, yet acted in direct contravention to that assertion when trial was again begun. The government gave no notice of a change in this position or notice of the need for a *James* hearing due to a change in their position – **yet the government began the subsequent trial with testimony of a co-conspirator's statement**.

The government argues it should not be held to its in court assertion, that the Court and defendants should not rely on an assertion made in open court by the government. [*Objections*, Doc. 88, p. 26, n. 19]. This argument is as startling as it is distressing. Perhaps the government's argument would be more persuasive had the May 7, 2003 assertion not been made by the government *after the jury was discharged* and *the trial rescheduled,* and thus made in *anticipation of and preparation for the forthcoming trial*, and made *in order to avoid the strategic disadvantage to the government of the disclosure inherent in a James hearing*, or had the government *at any time*

*between the May 2003 open court assertion and the June 2006 trial*[55] notified the Court or

defendants its position had shifted and they <u>now</u> intended to utilize co-conspirator's statements and

thus, a *James* hearing was needed, or had the government, at any time, complied with the Court's

scheduling order and notified the Court a *James* hearing was implicated. It did not. The assertion

made in May 2003 to abort the ongoing *James* hearing was not made as a concession in an effort to

proceed to trial, as the government argues, the trial had been aborted. The assertion was made, *after*

*the jury had been dismissed* and the trial rescheduled, when the only trial at issue was the

forthcoming trial – **the trial in which the government acted in direct contravention to its**

**assertion made in open court**.

Perhaps most disturbing, the government ignores its in court assertion, and rather, argues in

footnote 19 that one should not expect to be able to rely upon assertions made by an Assistant United

States Attorney. Certainly this cannot be the argument intended by the government.[56] The

---

[55] The May 19, 2003 trial date was lost upon the appeal by defendants of this Court's denial of their motion to dismiss and was reset once the Fifth Circuit had ruled on defendant's appeal.

[56] Government's Objections to the Report and Recommendation [Doc. 88] note 19:

> The government apparently is forever barred in this case from introducing a statement by a co-conspirator made during the course and in furtherance of the conspiracy, simply because at a status conference over three years prior to the mistrial at issue, when informing the Court that "he did not intend **at this point** to introduce any co-conspirator statements pursuant Federal Rules of Evidence 801(d)," the AUSA failed to specifically and precisely reference the exact subsection relating to co-conspirator statements, Rule 801(d)(2)(E).

This quote ignores the assertion **again**, made by the AUSA at the *James* hearing as an admission in open court, after the jury had been discharged and the trial rescheduled and in preparation for and anticipation of the subsequent trial. The government's actions made in direct contradiction to both assertions illustrates the government's cavalier attitude as to its admissions, and declarations and its ever changing position as to those admissions and declarations with no notice given to either the Court or defendants.

> Mr. Clemons:      But anyway Your Honor, the government does not intend at this point to introduce any coconspirator statements pursuant to Federal Rules of Evidence 801(d). The government went through the witnesses' interviews and 302s with my agents over the break[,] of those witnesses that we thought possibly would be providing coconspirator statements, and we've made the decision that, based on the statements

government made an assertion in open Court which could have served no other purpose, than to remove the trial disadvantage of the disclosure commanded by a *James* hearing – the Court and defendants relied on that assertion and aborted the *James* hearing. Without notice, the government began the subsequent trial with testimony involving a co-conspirator's statement which clearly mandated a *James* hearing. The government argues, regrettably, that neither the Court nor the defendants should have relied on repeated assertions made by the AUSA, not only at a pre-trial conference, but also, in open court. The government's argument suggests the government is free to make assertions, **to obtain a resultant trial advantage** and then change its conduct and act in direct contradiction to that assertion, to provide no notice its position has changed, cause the Court and defendants to rely on those assertions, and then be free to act in direct contravention to the assertions made. This Court finds such an argument unworthy of an officer of the Court, particularly the government, and deeply regrettable.

In further addressing the government's objections as to the third mistrial, this Court notes the government argues the matter should have proceeded to trial *in June 2006* and thus, the delay is in no way the government's fault. [*Objections*, Doc. 88, p. 28, n. 22]. This Court is, again, perplexed by the contradictory positions taken by the government. The *third* mistrial was declared by this Court solely as a result of the government's actions. The government filed a Motion for Reconsideration, which *the government withdrew in favor of filing a Motion to Dismiss the Indictment*. Thus, this Court finds the government's argument the government felt the matter should

---

we're aware of at this point, we don't intend to introduce any of those statements, and therefore the government sees no need for a hearing at this point because there are no statements that I can advise them I intend to introduce.

[*James* Hearing Tr., 5-6, May 7, 2003] (punctuation added for clarity).